53 A.3d 720

**Nancy A. WHITE, on Behalf of Herself and All Others Similarly Situated, Appellee**

v.

**CONESTOGA TITLE INSURANCE COMPANY, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 15, 2010.

Decided Aug. 20, 2012.

500

Darryl J. May, Daniel JT McKenna, Ballard Spahr LLP, Philadelphia, Anne Graber Blazek, Paul Lantieri III, Ballard Spahr LLP, Philadelphia, for Conestoga Title Insurance Company.

Jayson R. Wolfgang, Holly Lechliter Cline, Buchanan Ingersoll & Rooney, P.C., Harrisburg, for Appellant Amicus Curiae, Title Insurance Rating Bureau of Pennsylvania.

David A. Searles, Donovan Searles, L.L.C., Philadelphia, Philip S. Friedman, Richard S. Gordon, Martin E. Wolf, for Nancy A. White.

Ann Miller, Ann Miller, L.L.C., Elizabeth W. Fox, Todd Stowe Collins, Berger & Montague, P.C., Philadelphia, for Appellee Amicus Curiae, AARP and the Philadelphia Unemployment Project.

W. Christopher C. Doane, Amy Griffith Daubert, Harrisburg, Terrance A. Keating, PA Department of Insurance for Appellee Amicus Curiae, Joel S. Ario.

Adrian Nathaniel Roe, Pittsburgh, for Appellee Amicus Curiae, Class Action Plaintiffs.

Commonwealth of Pennsylvania–Ins. Department for Commonwealth of Pennsylvania–Ins. Department.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice TODD.

Alleging that Appellant Conestoga Title Insurance Company ("Conestoga" or the "Company") charged more for title insurance than its filed rates permitted, Appellee Nancy A. White asserted three claims against Conestoga in a class action complaint. We granted review to consider whether White is precluded from pursuing all of her claims because Article VII of the Insurance Department Act of 1921 (hereinafter, the

"TIA")[1] provides her with an exclusive administrative remedy under Section 1504 of the Statutory Construction Act of 1972 (the "SCA").[2] For the reasons that follow, we reverse in part and affirm in part. Specifically, we reverse the Superior Court's order reversing the trial court's dismissal of White's common law claims for money had and received and for unjust enrichment, and we affirm, albeit on different grounds, the Superior Court's order reversing the trial court's dismissal of White's statutory claim brought under Pennsylvania's Unfair Trade Practices and Consumer Protection Law (the "UTPCPL")[3] and remanding for further proceedings.

At all relevant times, Conestoga was a licensed title insurer, engaged in the business of underwriting and issuing title insurance[4] for properties in Pennsylvania. As such, Conestoga was subject to the mandates of the TIA and the regulatory authority of Pennsylvania's Insurance Commissioner (the "Commissioner"), who has the power and duty to enforce and carry out all of the TIA's provisions. *See* 40 P.S. §§ 59, 910–1, 910–3, 910–22, 910–46(d). Under Section 737 of the TIA, Conestoga was required to file the rates it charged for title insurance with the Commissioner and was prohibited from charging "any fee for any policy or contract of title insurance

1. Act of May 17, 1921, P.L. 682, art. VII (as amended, 40 P.S. §§ 910–1–910–55). Article VII of the Insurance Department Act of 1921 regulates title insurance companies and other persons and entities engaged in the business of title insurance. 40 P.S. § 910–2. Article VII is colloquially referred to as the "Title Insurance Act" or the "Title Insurance Company Act."

2. Act of Dec. 6, 1972, P.L. 1339, No. 290 (as amended, 1 Pa.C.S.A. §§ 1501–1991).

3. Act of Nov. 24, 1976, P.L. 1166, No. 260 (as amended, 73 P.S. §§ 201–1 to 201–9.3).

4. The TIA defines "Title Insurance" as:
   insuring, guaranteeing or indemnifying against loss or damage suffered by owners of real property or by others interested therein by reason of liens, encumbrances upon, defects in or the unmarketability of the title to said real property; guaranteeing, warranting or otherwise insuring the correctness of searches relating to the title to real property; and doing any business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of this article.
   40 P.S. § 910–1(1).

except in accordance with filings or rates" it submitted. *See* 40 P.S. § 910–37(a)–(e), (h). Conestoga's filed rates, as set forth in the "Title Insurance Manual of Rates, Policies and Endorsements for the Commonwealth of Pennsylvania" (the "Rate Manual") submitted to the Department, were: (1) the "Basic Rate;" (2) the "Reissue Rate," which was 90% of the basic rate, and available if the property to be insured was identical to property insured within the last 10 years and evidence of the earlier policy was produced; and (3) the "Refinance Rate," which was 80% of the reissue rate, and available if the property to be insured had been insured by a reputable title insurer other than Conestoga within the last three years. Rate Manual (Exhibit I to Plaintiff's Motion for Class Certification).

On December 6, 2006, White filed a class action complaint against Conestoga in the Court of Common Pleas of Philadelphia County. In her complaint, White alleged that she refinanced the mortgage on the home she owned on October 30, 2002, obtaining title insurance at the closing, and refinanced the mortgage on her home once again on February 17, 2005, purchasing title insurance from Conestoga. She further alleged that, even though she satisfied the criteria for Conestoga's Refinance Rate of $406.63 for the title insurance she purchased in 2005, Conestoga charged her the higher rate of $508.28, thereby unlawfully pocketing $101.65 of her money. White also alleged that Conestoga's agents could have learned from documents tendered at closings that homeowners, like herself, were eligible for either one of the Conestoga's reduced rates, but knowingly and intentionally failed to avail themselves of that information, in order to charge the homeowners a higher premium. In addition, she averred that Conestoga engaged in a pervasive, long-standing scheme of deception in which it willfully refused to apply its Reissue and Refinance Rates to the financial detriment of hundreds of purported class members.

Based on these allegations, White asserted three claims in her individual capacity and as the representative of a class of all persons who refinanced their mortgages and were

charged a title insurance premium that exceeded Conestoga's applicable discounted rate. In Count I, White brought a common law claim for money had and received, averring that Conestoga came into possession of money to which it had no right at law or in equity.[5] In Count II, she brought a common law claim for unjust enrichment, asking for restitution of the excessive amounts paid to Conestoga.[6] In Count III, she made a claim under Section 9.2 of the UTPCPL, averring that Conestoga committed a *per se* violation of the statute's proscription against unfair or deceptive trade practices by charging rates in excess of the rates the Company was permitted to charge under Section 737 of the TIA. *See* 73 Pa.S.A. § 201–9.2(a);[7] 40 P.S. § 910–37(h).

In its answer and new matter, Conestoga denied that the premiums it charged White and class members she sought to represent did not comply with its filed rates,[8] and raised

5. A cause of action of action for money had and received is a claim by which the plaintiff seeks to recover money paid to the defendant by mistake or under compulsion, or where the consideration was insufficient. *See Springfield Twp. v. PSFS Bank*, 586 Pa. 1, 4 n. 2, 889 A.2d 1184, 1186 n. 2 (2005).

6. A cause of action for unjust enrichment is a claim by which the plaintiff seeks restitution for benefits conferred on and retained a defendant who offered no compensation in circumstances where compensation was reasonably expected. *See American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 606 Pa. 584, 594 n. 7, 2 A.3d 526, 532 n. 7 (2010).

7. Section 9.2 of the UTPCPL provides, in relevant part:

   § 201–9.2. Private actions
   (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.
   73 P.S. § 201–9.2(a) (footnote omitted).

8. The record reflects that Conestoga took the position that, under its filed rates, eligibility for the Reissue or Refinance Rate required the

several defenses, including a challenge to the trial court's jurisdiction due to the existence of an exclusive statutory remedy. In opposing the motion for class certification filed by White at the close of discovery, Conestoga again questioned the trial court's jurisdiction. Specifically, Conestoga contended that, since Section 744(b) and Section 449 of the TIA provide an exclusive statutory remedy for resolution of the parties' dispute regarding the rate White was charged for title insurance, the trial court lacked jurisdiction to adjudicate her claims under Section 1504 of the SCA.

Given their centrality to the issues before us, we quote Sections 744 and 749 of the TIA, and Section 1504 of the SCA, in full. Sections 744 and 749 of the TIA provide:

§ 910–44. Information to be furnished insureds; hearings and appeals of insureds

(a) Every rating organization and every title insurance company which makes its own rates shall, within a reasonable time after receiving written request therefor and upon payment of such reasonable charge as it may make, furnish to any insured affected by a rate made by it, or to the authorized representative of such insured, all pertinent information as to such rate.

(b) *Every rating organization and every title insurance company which makes its own rates shall provide, within this Commonwealth, reasonable means whereby any person aggrieved by the application of [a title insurer's] rating system may be heard, in person or by his authorized representative, on his written request to review the manner in which such rating system has been applied in connection with the insurance afforded him.* If the rating organization or title insurance company fails to grant or reject such request within thirty days after it is made, the applicant may proceed in the same manner as if his application had been rejected. *Any party affected by the action of such rating organization or such title insurance company on such request may, within thirty days after written notice of*

production of a copy, or other evidence, of a prior policy of title insurance by the homeowner. *See* N.T., 3/3/2008, at 58–60.

*such action, appeal to the commissioner, who,* after a hearing held upon not less than ten days written notice to the appellant and to such rating organization or insurer, *may affirm or reverse* such action.

§ 910–49. Hearing procedure and judicial review

(a) *Any* title insurance company, rating organization or *person aggrieved by any action of the commissioner,* except disapproval of a filing or a part thereof, or by any rule or regulation adopted and promulgated by the commissioner, *shall have the right to file a complaint with the commissioner and to have a hearing thereon before the commissioner.* Pending such hearing and the decision thereon, the commissioner may suspend or postpone the effective date of his previous action, rule or regulation.

(b) *All hearings provided for in this article shall be conducted, and the decision of the commissioner on the issue* or filing involved *shall be rendered, in accordance with the provisions of the act of June 4, 1945 (P.L. 1388), known as the "Administrative Agency Law," relating to adjudication procedure.*[9]

40 P.S. §§ 910–44, 910–49 (footnotes omitted) (emphasis added). Section 1504 of the SCA provides:

§ 1504. Statutory remedy preferred over common law

In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the

9. In turn, the Administrative Agency Law gives "[a]ny person aggrieved by an adjudication of a Commonwealth agency ... the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure)." 2 Pa.C.S.A. § 702. The Administrative Agency Law, in relevant part, defines an "Adjudication" as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." *Id.* at § 101.

common law, in such cases, further than shall be necessary for carrying such statute into effect.

1 Pa.C.S.A. § 1504.

██ Following a hearing on White's motion for class certification, the trial court issued an opinion and order, in which it concluded that, regarding White's claims, the TIA sets forth an exclusive statutory mechanism within the meaning of Section 1504 of the SCA and that, therefore, White failed to exhaust her statutory remedy.[10] Accordingly, the trial court

10. Citing this Court's decision in *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 603 Pa. 198, 983 A.2d 652 (2009), Conestoga expresses its concern that, by speaking in terms of administrative exhaustion, the trial court blurred a distinction this Court has drawn between Section 1504's directive regarding the mandatory nature of exclusive remedies and the judicial doctrine of exhaustion of administrative remedies, but asserts the distinction is presently immaterial because both rules require White to pursue relief under Sections 744(b) and Section 449 of the TIA. *See* Brief of Conestoga Title Insurance at 21 n.4.

In *Liss*, the plaintiff law firm brought a breach of contract claim against the defendants on behalf of its client and others similarly situated, seeking to recover alleged overcharges for the copying of medical records. In upholding the entry of summary judgment in the plaintiff's favor, we rejected the defendants' argument that the plaintiff was precluded from asserting a common law claim because of the statutory remedy set forth in the Medical Records Act ("MRA"), 42 Pa.C.S. §§ 6151–6160. We determined that the obligation to exhaust administrative remedies did not apply because the MRA has no administrative process to which the plaintiff would have had resort before filing its common law claim. 603 Pa. at 211, 983 A.2d at 660. We further determined that Section 1504's directive was not implicated because there is no evidence of legislative intent in the MRA to limit the plaintiff's common law rights or preempt common law causes of action. 603 Pa. at 212, 983 A.2d at 660. In so doing, we observed that the defendants "appear to confuse two doctrines: exhaustion of administrative remedies and preference of statutory remedies over the common law [under Section 1504,]" and stated that "even if [the defendants'] argument were clear, however, we would not afford [them] relief under either theory." 603 Pa. at 211, 983 A.2d at 660.

We take this opportunity to clarify it is not the case, as suggested in *Liss*, that there is a rule of exhaustion premised on Section 1504 and a separate judicial exhaustion doctrine based solely on jurisprudential considerations. Rather, as our case law reveals, the rule of exhaustion stated in Section 1504 works in concert with the exhaustion doctrine developed by this Court. We long ago recognized that Section 1504's command that a statutory remedy "shall be strictly pursued" states an exhaustion requirement, such that a litigant can neither forgo nor abandon, before completion, the administrative process the legislature

dismissed White's complaint with prejudice for lack of jurisdiction,[11] and denied White's motion for class certification as moot.

has devised as a means of resolving a dispute. *Ohio Cas. Group of Ins. Cos. v. Argonaut Ins. Co.*, 514 Pa. 430, 435, 525 A.2d 1195, 1197 (1987) (citing 1 Pa.C.S.A. § 1504); *Jackson v. Centennial Sch. Dist.*, 509 Pa. 101, 107, 501 A.2d 218, 220 (1985). That said, and notwithstanding Section 1504's facial command that a statutory remedy is to be strictly pursued in "all cases," *see* 1 Pa.C.S.A. § 1504, this Court has determined the rule of exhaustion encompassed therein does not apply absolutely, and has developed exceptions to Section 1504's mandate based on prudential concerns. Thus, for example, where the administrative remedy was deemed inadequate, *i.e.*, it was unable to address the legal issues presented and effectively provide relief to all those in a position to seek it and presented a substantial question of constitutional import or would result in duplicative and piecemeal litigation likely to yield inconsistent results, or would lead to irreparable harm, we permitted a litigant to bypass the administrative process and seek relief in a court of law. *See, e.g., Kowenhoven v. County of Allegheny*, 587 Pa. 545, 901 A.2d 1003 (2006); *Pentlong Corp. v. GLS Capital, Inc.*, 573 Pa. 34, 820 A.2d 1240 (2003); *Borough of Green Tree v. Bd. of Prop. Assessments, Appeals & Review*, 459 Pa. 268, 278, 328 A.2d 819, 824 (1974) (plurality); *Bliss Excavating Co. v. Luzerne County*, 418 Pa. 446, 451, 211 A.2d 532, 535 (1985). Accordingly, we consider the respective arguments the parties have made in the instant appeal within this framework, and we determine whether Section 744(b) and Section 449 of the TIA constitute a remedy for White that falls within Section 1504's mandate in the first instance, and if so, whether White presents any of the reasons we have accepted as sufficient to excuse her from exhausting the administrative process the legislature has provided.

11. In *School Dist. of Borough of West Homestead v. Allegheny*, 440 Pa. 113, 269 A.2d 904 (1970), we suggested that Section 1504 is jurisdictional, stating that, when the statutory rule applies, "no action may be brought in any 'side' of the Common Pleas to adjudicate the dispute by any kind of 'common law' form of action other than the exclusive statutory method[.]" 440 Pa. at 118, 269 A.2d at 907; *see also Pentlong*, 573 Pa. at 42, 820 A.2d at 1245 ("[W]here a legal remedy exists, a court is divested of equity jurisdiction"); *Lilian v. Commonwealth*, 467 Pa. 15, 18, 354 A.2d 250, 252 (1976) (collecting cases) ("Where such an administrative remedy is statutorily prescribed [under Section 1504] the general rule is that a court—be it a court of equity or a court of law—is without jurisdiction to entertain the action."); *cf. Borough of Green Tree*, 459 Pa. at 273 & n. 4, 328 A.2d at 821 & n. 4 (acknowledging the common pleas court noted that a question existed as to its jurisdiction to adjudicate plaintiffs' action in view of the statutory appeal procedure and that it was the obligation of the court to raise and decide the jurisdictional question *sua sponte* ).

However, in other cases, we have characterized the doctrine of administrative exhaustion as jurisprudential, *i.e.*, a rule that does not divest a court of subject matter jurisdiction, but, rather, serves as a

On appeal, in a published opinion, a unanimous panel of the Superior Court held that the trial court erred in dismissing White's claims and, accordingly, reversed and remanded. *White*, 982 A.2d at 997. Observing that the TIA provides a remedy to those "aggrieved" by a title insurer's "application" of its rates, the court concluded the TIA was "wholly inapplicable" in White's case because she alleged that Conestoga engaged in a pervasive scheme of deceptive business practices by disregarding, rather than applying, its filed rates. *Id.* at 1004 (quoting 40 P.S. § 910–44(b)) (emphasis omitted). The court reasoned:

> White alleges that Conestoga engaged in deceptive business practices and pervasively overcharged policy holders, including herself, by imposing the highest approved rate, regardless of consumers' qualification for a discounted rate. White is not merely claiming that Conestoga failed to apply the proper rate, but rather alleged that Conestoga did not apply the rate structure *at all;* and merely imposed the highest rate on unsuspecting consumers without any discre-

prerequisite to the court's exercise of its subject-matter jurisdiction. *Jackson*, 509 Pa. at 107 n. 5, 501 A.2d at 221 n. 5 ("Frequently, it is said that the failure to exhaust administrative remedies divests the court of 'jurisdiction.' This is not subject-matter jurisdiction, however, but rather the judge-made rule that exhaustion of administrative remedies is a prerequisite to the court's exercise of subject-matter jurisdiction."); *see also Beattie v. Allegheny County*, 589 Pa. 113, 124 n. 5, 907 A.2d 519, 526 n. 5 (2006) (emphasis in original) ("This exception [which recognizes that the administrative process is ill-suited to resolve certain types of constitutional questions] has at times been couched in terms of whether the trial court has equity jurisdiction to entertain the complaint. We have clarified, however, that the requirement of administrative exhaustion is a judge-made rule and does not pertain to the *existence* of subject matter jurisdiction, but to whether such jurisdiction is properly exercised.").

We need not address how this conflict may (or may not) affect a trial court's ability to raise *sua sponte* Section 1504—or the exhaustion doctrine generally—since Conestoga asserted a statutory-exclusivity defense at the court of common pleas level, *see* Answer to Complaint with New Matter at 5 (R.R. 45a), and the issue has been preserved throughout this litigation, *see, e.g., White v. Conestoga Title Insurance Co.*, 982 A.2d 997, 1002 (Pa.Super.2009). Parenthetically, however, we observe that, under our civil procedural rules, a defendant's failure to include such a defense in its preliminary objection, answer, or reply does not result in a waiver of that defense. *See* Pa.R.Civ.P. 1032(a).

tion or deference to the rate structures approved by the Commissioner. Aside from the fact that White's complaint references the rate structure, we find that the [TIA] is wholly inapplicable to White's claims.

*Id.* (emphasis in original). The court added: "Perhaps a straight forward grievance concerning an overpayment due to misapplication of the rate can be solved exclusively in an administrative context, but when the claim involves alleged deceptive insurance company practices that fall under the UTPCPL, it is clear that the legislature did not intend for the [TIA] to provide an exclusive remedy." *Id.* at 1006.

In further support of its conclusion, the court reasoned: (1) the General Assembly could not have intended the TIA to be the exclusive remedy for claims of deceptive insurance practices, given that the Unfair Insurance Practices Act ("UIPA"), 40 P.S. §§ 1171.1–1171.15, a more pertinent statute incorporated into the TIA, did not provide a remedy to consumers for such claims; (2) just as the General Assembly did not intend to limit the Commissioner to the penalties articulated in the TIA for statutory violations, it did not intend to limit consumers of title insurance who were allegedly subjected to deceptive trade practices to the remedy for a rate misapplication in the TIA; [12] (3) the Commissioner's position, as *amicus curiae,* that the TIA's remedy does not displace the private right of action under the UTPCPL, was entitled to great weight; (4) the court's prior decision in the workers' compensation insurance setting, *Maryland Casualty Co. v. Odyssey Contracting Corp.,* 894 A.2d 750 (Pa.Super.2006), was inapt due to the absence in the present case of commercial parties governed by complicated rate classifications and a Pennsylvania rate manual; [13] and (5) the remedial provisions of the TIA, even when

12. For this proposition, the court relied on Section 748 of the TIA, which specifies the penalties the Insurance Commissioner may impose under the TIA and then states: "Such penalties may be in addition to any other penalty provided by law." 40 P.S. § 910–48(a).

13. In *Maryland Casualty,* the Superior Court held that an insured, sued by its insurer for breach of contract for failure to pay the workers' compensation insurance premiums it owed, was precluded from bringing a counterclaim asserting that the insurer knowingly applied an

applicable, do not require a consumer alleging violations of the UTPCPL to complain first to the insurer to preserve his grievance, since the word "may" appears in Section 744(b) to describe the administrative steps available to a person allegedly aggrieved by a rate overcharge. *White*, 982 A.2d at 1004–1007 & n. 7 (quoting 40 P.S. § 910–44(b)).

■ Lastly, the court addressed the doctrine of primary jurisdiction and concluded that the question of whether White and the class members she sought to represent were improperly denied a discounted rate did not require the expertise of the Commissioner and could be easily resolved by the trial court by application of the language in the Rate Manual. *Id.* at 1009.[14] Accordingly, the Superior Court instructed the trial court on remand as follows: "If it is determined that the class of consumers received an inflated rate, it is solely within the province of the trial court to subsequently determine whether Conestoga engaged in deceptive and fraudulent business practices in violation of the common law and the UTPCPL." *Id.*

We allowed appeal, on Conestoga's petition, to consider whether the TIA's remedial provisions constitute an exclusive remedy within the meaning of Section 1504 of the SCA. *White*

improper rate classification in order to charge a higher premium, as the Pennsylvania Workers' Compensation Manual gave the Pennsylvania Compensation Rating Bureau the exclusive statutory authority to address the parties' dispute. 894 A.2d at 754.

14. Although the trial court determined it did not have jurisdiction over any of White's claims under Section 1504 of the SCA and dismissed her complaint in its entirety, the Superior Court concluded the trial court erroneously applied the doctrine of primary jurisdiction. 982 A.2d at 1009.

Briefly, the doctrine of primary jurisdiction is jurisprudential, developed by this Court to accommodate "the respective spheres of adjudicatory authority" of the Commonwealth's administrative agencies and the common pleas courts. *Elkin v. Bell Telephone Co. of Pennsylvania*, 491 Pa. 123, 131–32, 420 A.2d 371, 374 (1980). Under the doctrine, a trial court, which has subject matter jurisdiction over a claim, determines that an agency's expertise is needed on a particular issue. Accordingly, it refers the question to the agency and stays judicial proceedings, pending the agency's determination. The agency's subsequent determination on the issue, when final, is binding and not subject to collateral attack upon the resumption of judicial proceedings. 491 Pa. at 133–34, 420 A.2d at 376–77.

*v. Conestoga Title Ins. Co.*, 606 Pa. 50, 994 A.2d 1083 (2010) (order).[15]  As this issue raises a question of law, our standard of review is *de novo* and our scope of review is plenary. *Dechert LLP v. Commonwealth*, 606 Pa. 334, 340, 998 A.2d 575, 579 (2010).[16]

Conestoga argues that Section 1504 of the SCA codifies the long-standing rule in Pennsylvania that, when a statute articulates a remedy for the breach of a statutory obligation, that remedy is exclusive and must be strictly pursued to the exclusion of all "civil action remedies" seeking relief for the harm that results from an alleged breach of that obligation. *See* Brief of Conestoga Title Insurance Company at 34.  Conestoga asserts that the TIA is one such statute, in that it obligated the Company to charge White no more than its applicable filed rate for the title insurance she purchased, and provides her with a process by which she may secure redress, if she establishes, as she averred in her complaint, that the Company should have charged her a lower rate.  Thus, Conestoga contends, all three claims in White's complaint are foreclosed by Section 1504.

**15.**  The sole question Conestoga set forth in its Petition for Allowance of Appeal was as follows:

> In reversing the Common Pleas Court's dismissal of this action for lack of jurisdiction by reason of the administrative remedy provided by the [TIA] at 40 P.S. § 910-44(b), did the Superior Court err by holding that the statutory and decisional rule that adequate administrative remedies are exclusive does not apply to consumer class actions?

Petition at 3. However, Conestoga's question was not cast in the form our Rules of Appellate Procedure contemplate for Petitions of Allowance of Appeal.  *See* Pa.R.A.P. 1115(a)(3).  Rather, it was a summary of only one of the several reasons Conestoga gave in its Petition for its broad contention that the Superior Court's ruling that the TIA's remedy did not fall within the purview of Section 1504, and thereby precluded White from pursuing her claims, was erroneous and, therefore, worthy of our discretionary review.  Our review thus encompasses each of those several reasons.

**16.**  In its answer and new matter, Conestoga alleged that White's complaint fails to state a claim upon which relief may be granted.  For purposes of this appeal, we assume, without deciding, that the allegations in White's complaint are legally sufficient to state the claims she asserts.

Conestoga continues that the Superior Court's ruling that the TIA is inapplicable flies in the face of the allegations in White's complaint, which repeatedly reference the TIA's mandate that Conestoga charge only its filed rates, and disregards that, but for the TIA, White would have no basis to complain about the rate she was charged. Conestoga also challenges the court's construction of the TIA's remedy as permissive, based on the General Assembly's use of the word "may" in Section 744(b), and its policy decision in Section 748 to allow for cumulative penalties. *See* 40 P.S. §§ 910–44(b), 948. According to the Company, use of the word "may" merely reflects the choice an insured has been given between foregoing and pursuing a statutory claim regarding the rate she was charged, while Section 748 relates only to the Insurance Commissioner's enforcement authority.

Conestoga also challenges the Superior Court's disregard of its precedent in *Maryland Casualty, supra,* arguing there is no principled basis upon which to distinguish the remedial scheme in the TIA from that established in the Workers' Compensation Act for resolving rate application disputes between an insurer and its insured. Relying on this Court's decision in *Lilian v. Commonwealth,* 467 Pa. 15, 20, 354 A.2d 250, 253 (1976), Conestoga further maintains that the Superior Court's decision impermissibly carves out an exception to the exclusivity of remedy rule in Section 1504 of the SCA for consumer claims brought in a class action complaint. In addition, the Company objects to the Superior Court's view that the TIA incorporated the UIPA, and asserts that, in any event, the UIPA has no bearing on the issue before us. As a final point, Conestoga complains that the Superior Court did not discuss White's common law causes of action for money had and received and unjust enrichment, but grounded its decision entirely on White's allegations of deceptive trade practices, which related only to her UTPCPL claim.

White counters that none of the claims in her complaint should be dismissed on the basis of the TIA's remedial provisions. Although White concedes a remedy is stated in Section 744(b) and another is stated in Section 749, she asserts that

neither remedy applies in her case. It is her position that, since Section 744(b) concerns the "application" of a rate, while Section 749 concerns an "action" the Commissioner may take, the allegations in her complaint regarding Conestoga's systematic and deceptive disregard of its filed rates are simply not covered by either section. *See* 40 P.S. §§ 910–44(b), 910–49. White adds that Section 744(b) is incapable of addressing an insurer's scheme of deceptive trade conduct because there is no reference therein to a party's entitlement to the panoply of procedural rights the Administrative Agency Law provides, as there is in Section 749. *Id.*

White argues, alternatively, that, even if her allegations against Conestoga fall within the TIA's remedial scope, its remedies are cumulative and discretionary, given the permissive language the General Assembly used in Section 744(b) and the fact that penalties are made cumulative under Section 748. *See id.* §§ 910–44(b), 910–48. In addition, she suggests that construing the TIA's procedure as permissive is required under the Remedies Clause of the Pennsylvania Constitution so as not to deny her a means of redressing the fraud and deceit Conestoga allegedly perpetrated upon its customers. *See* Pa. Const. art. I, § 11.

Relying on this Court's recognition that, in certain circumstances, a party need not exhaust the administrative remedy the legislature has provided, White further argues that, because the TIA's administrative process is inadequate, she should be excused from pursuing it. *See supra* note 10. She asserts the inadequacy of the TIA's remedy is reflected in the fact that Conestoga neglected to establish a reasonable means whereby she or any other consumer can ask for review of the rate charged, as Section 744(b) requires. She also contends that any means of review Conestoga might establish thereunder will not, in any event, provide consumers with a meaningful process of dispute resolution. *See* 40 P.S. § 910–44(b). White further asserts the TIA's procedure, which gives her a refund of a premium over-payment, is inadequate because it does not make available the punitive or treble damages and

the attorneys fees she seeks from Conestoga in the court of common pleas.

White also takes exception to Conestoga's characterization of the Superior Court's opinion as countenancing exceptions from Section 1504 of the SCA for consumer claims asserted in a class action. According to White, any references the Superior Court made to the class action allegations in her complaint were merely descriptive, and did not form the basis of the Superior Court's decision, nor did it contradict this Court's ruling in *Lilian*. Finally, White urges us to adopt the view expressed by the Insurance Commissioner throughout this litigation, as *amicus*, that the TIA does not preclude access to the right of action the UTPCPL provides to consumers who are victimized by an insurer's deceptive business practices.[17]

We begin our analysis by observing that the rule stated in Section 1504 of the SCA regarding the exclusivity of a statutory remedy raises a question of statutory construction. *See Liss*, 603 Pa. at 211–12, 983 A.2d at 660. When construing a statute, we must ascertain and effectuate the intent of the General Assembly in enacting the statute. 1 Pa.C.S.A. § 1921(a). In this regard, we are instructed: "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of

17. The Insurance Commissioner submitted an *amicus curiae* brief in this Court supporting White. Focusing his discussion on White's UTPCPL claim, the Commissioner expresses the view that this case presents a choice between two statutory remedies, one of which, in the TIA, provides no meaningful remedy to address allegations that an insurer intentionally disregarded its approved rate structure and engaged in a deceptive scheme to overcharge its customers, and the other, in the UTPCPL, which does. The Commissioner posits that the TIA's procedure was intended to correct nothing more than the good faith, but mistaken, application of a title insurer's filed rates and was not enacted, as was the private right of action in the UTPCPL, for the purpose of compensating consumers victimized by an insurer's deceptive trade practices. Therefore, the Commissioner asserts, the TIA's remedy cannot be considered exclusive in the present case under Section 1504 of the SCA.

The AARP, the Philadelphia Unemployment Project, and the Class Action Plaintiffs also serve as White's *amici*. The Title Insurance Bureau of Pennsylvania filed *amicus curiae* briefs in support of Conestoga.

pursuing its spirit." *id.* Thus, the best indication of the General Assembly's intent in enacting a statute may be found in its plain language. *Martin v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing,* 588 Pa. 429, 438, 905 A.2d 438, 443 (2006). In addition, we are to read the sections of a statute together and construe them to give effect to all of the statute's provisions. 1 Pa.C.S.A. § 1921(a). Except for words and phrases that have acquired a peculiar meaning or have an applicable definition, we are to construe the words and phrases in a statute "according to the rules of grammar and according to their common and approved usage." *Id.* § 1903. We are to presume that, "[w]hen a court of last resort has construed the language in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." *Id.* § 1922(4). We are also to presume that the General Assembly is familiar with extant law when enacting legislation. *White Deer Township v. Napp,* 603 Pa. 562, 590, 985 A.2d 745, 762 (2009).

The rule regarding the exclusive nature of a statutory remedy is one of Pennsylvania's oldest legal principles. Over 200 years ago, in 1806, the General Assembly codified the rule, stating:

> In all cases where a remedy is provided or duty enjoined or anything directed to be done in any act of assembly, the direction of the said act shall be strictly pursued and no penalty be inflicted or anything done agreeable to the provisions of the common law in such cases further than shall be necessary for carrying such Act into effect.

Act of March 21, 1806, P.L. 58, 4 Sm.L. 326 § 13 ("Act of 1806") (46 P.S. § 156).[18]

Thereafter, we consistently construed the Act of 1806 as a mandate, which required a party to strictly follow a statutory remedy, when one is provided, to the exclusion of a common law claim. *See, e.g., Pittsburgh Coal Co. v. Sch. Dist. of Forward Twp.,* 366 Pa. 489, 494 78 A.2d 253, 256 (1951)

---

**18.** As we discuss below, Section 1504 of the SCA is the successor to the Act of 1806.

(explaining that the Act of 1806 is an inhibition against the use of a common law remedy where a statutory remedy obtains). Additionally, we construed the Act of 1806 to allow for the invocation of the common law only if necessary to supply omissions or correct defects in the statutory remedial procedure. *Hare v. Commonwealth,* 92 Pa. 141 (1879).[19] Moreover, our application of the statutory exclusivity rule in the Act of 1806 did not depend on the existence of terms in the governing statutory scheme which mandated a party, if aggrieved, to pursue the provided statutory relief. *See, e.g., Calabrese v. Collier Twp. Mun. Auth.,* 430 Pa. 289, 294, 240 A.2d 544, 547 (1968) (a party who challenges the reasonableness of a sewage rate "may," according to this Court, bring suit under the Municipalities Authorities Act of 1945); *Bartron v. Northumberland County,* 342 Pa. 163, 19 A.2d 263 (1941) (a party affected by abolition of grade crossings proceedings, in the words of the statute, "may" appeal under 66 P.S. § 811).

Accordingly, in case after case, upon observing that the General Assembly provided a statutory means to resolve a dispute and provide relief to a complaining party, we upheld the termination of a common law cause of action under the Act of 1806.[20] Where, however, the legislature made its intent clear in a statute that the mandate in the Act of 1806 was not

19. This limited exception stated in the Act of 1806 and in its successor allowing for the invocation of the common law even where a statutory remedy exists, has played no part in this case; it was not raised by the parties, nor was it considered by the lower courts.

20. *See, e.g., Commonwealth v. Glen Alden Corp.,* 418 Pa. 57, 210 A.2d 256 (1965) (action in equity to abate burning coal refuse piles as a public nuisance); *Lurie v. Republican Alliance,* 412 Pa. 61, 192 A.2d 367 (1963) (action in equity to compel an accounting by a political association); *Valley Smokeless Coal Co. v. Hager,* 292 Pa. 440, 141 A. 257 (1928) (action in assumpsit to recover for unlawful mining of coal); *Curran v. Delano,* 235 Pa. 478, 84 A. 452 (1912) (action in equity to determine width of barrier pillar in a mine); *Beltzhoover Borough v. Gollings,* 101 Pa. 293 (1882) (action in trespass for damages resulting from street improvements); *Suydam v. Northwestern Ins. Co.,* 51 Pa. 394 (1865) (action in equity to obtain funds of insolvent corporation); *Moyer v. Kirby,* 14 Serg. & Rawle 162 (1826) (action at law for collection of a corporate debt); *Spigelmoyer v. Walter,* 3 Watts & Serg. 540 (1842) (action in equity for abatement of a dam).

to govern, we, of course, followed that directive.[21]

In *School Dist. of Borough of West Homestead, supra,* a decision we presently find instructive, we addressed a school district's contention that, despite the command in the Act of 1806, the school district was free to bypass the procedure supplied in the Supplemental Reorganization Act (now repealed) for seeking relief from a board's organizational plan and ask a court sitting in equity for an injunction instead. The procedure at issue was set forth in several sections of the Act, which, when read together, permitted, but did not require, a school district, which was allegedly aggrieved by a county board's plan of organization, to appeal to the State Board, and, then, take a further appeal to the common pleas court. 440 Pa. at 119, 269 A.2d at 907–08. Concluding that "[e]ven the most cursory reading of the Act reveals a comprehensive and constitutionally adequate procedure which is the exclusive procedure available to a school district which considers itself aggrieved by the actions of the County and State Boards," we held that the school district could not avoid the legislature's chosen remedial scheme by commencing a common law action. 440 Pa. at 121, 269 A.2d at 908. In so doing, we rejected the school district's assertion that the statutory remedy was inadequate because the county board failed to comply with the procedural directives the Act imposed, observing that such a complaint could and should have been made in the administrative hearing before the State Board under the Act. 440 Pa. at 122, 269 A.2d at 909. Moreover, we summarized our construction of the Act of 1806, thusly:

> This statute says in unambiguous language that, if the legislature provides a specific, [e]xclusive, constitutionally adequate method for the disposition of a particular kind of dispute, no action may be brought in any 'side' of the

21. *See, e.g., Borough of Brookhaven v. American Rendering, Inc.,* 434 Pa. 290, 256 A.2d 626 (1969) (all common law remedies and rights of action to abate public or private nuisance preserved in the Air Pollution Control Act of 1968); *Emerald Coal and Coke Co. v. Equitable Gas Co.,* 378 Pa. 591, 107 A.2d 734 (1954) (all remedies and rights of action preserved in the Public Utility Law of 1937); *Commonwealth v. New York & Pennsylvania Co.,* 367 Pa. 40, 79 A.2d 439 (1951) (same in the Pure Streams Act of 1937).

Common Pleas to adjudicate the dispute by any kind of 'common law' form of action [other] than the exclusive statutory method ... unless the statute provides for it or unless there is some irreparable harm that will follow if the statutory procedure is followed.

It is equally clear that, if the method for disposing of the dispute is [n]ot exclusive, some appropriate form of common law action in the Court of Common Pleas may be available, and the Common Pleas may have jurisdiction.

440 Pa. at 118–19, 269 A.2d at 907.

Two years later, in 1972, the legislature repealed the Act of 1806 and simultaneously reenacted it in the SCA, at Section 1504, in almost identical language and without indicating any disagreement with this Court's prior construction of the statute. *See supra* pp. 506–07, 53 A.3d pp. 725–26. Like the Act of 1806, with respect to Section 1504, we have reiterated: "[W]here a statutory remedy is provided, the procedure prescribed therein must be strictly pursued to the exclusion of other methods of redress;" but, where the legislature explicitly reveals in a statute that it does not intend for such exclusivity, a statutory procedure for dispute resolution does not preempt common law claims. *See Jackson,* 509 Pa. at 106, 501 A.2d at 220; *Deluca v. Buckeye Coal Co.,* 463 Pa. 513, 519, 345 A.2d 637, 640 (1975). Moreover, we have declined to apply Section 1504 where we determined that a statutory procedure did not contemplate the grievance in question. *Liss,* 603 Pa. at 212, 983 A.2d at 660; *see also Terminato v. Pennsylvania Nat. Ins. Co.,* 538 Pa. 60, 645 A.2d 1287 (1994) (quoting *Lashe v. Northern York County School Dist.,* 52 Pa.Cmwlth. 541, 548, 417 A.2d 260, 264 (1980) ("If the statute does not apply to a controversy, it obviously is not intended to be any remedy, much less an exclusive remedy.")).

Further, in *Lilian, supra,* where the named plaintiffs bypassed the procedure the Tax Reform Code provided for securing a sales tax refund, and, instead, brought a class action in equity against the Commonwealth asking for a refund of the sales tax they and the class members had paid, we explained that the class action in Pennsylvania is a proce-

dural device designed to promote efficiency in the handling of a large number of similar claims, such that class status or the lack of it, alone, is irrelevant to the question of whether a common law action is available in light of the existence of a statutory remedy. 467 Pa. at 21, 354 A.2d at 253–54. *See* Pa.R.C.P. 1702, Explanatory Comment ("Where a specific statutory remedy is provided for the processing of claims, numerosity of claims will not justify a class action. This follows the classic principle that a statutory form of relief must be followed exclusively.")

As applied to the instant case, our review of these guiding principles reveals a fundamental flaw in the Superior Court's approach, which, we observe, was echoed by the parties in their respective briefs. The court below assumed that a single analysis was sufficient to determine whether all the claims White asserted in her complaint could continue under Section 1504, and, accordingly, failed to differentiate between White's common law causes of action and her statutory claim under the UTPCPL, and focused only on the latter. We are of the view, however, that White's common law claims must be addressed separately from her UTPCPL claim, given the terms of Section 1504 and our long-standing construction of its mandate.

We, therefore, first consider White's common law claims for money had and received and unjust enrichment. Fundamentally, the allegations White made against Conestoga in Counts I and II of her complaint, and the position the Company has taken in its defense, concern whether the premium White paid for title insurance was in accordance with the Company's filed rates. On the one hand, White contends that Conestoga should have charged her no more than the Refinance Rate; on the other, Conestoga asserts its higher charge was entirely consistent with the Rate Manual it filed with the Commissioner. In this regard, Sections 744(b) and 749 of the TIA, when read together, set forth a procedure that both addresses the parties' dispute regarding the propriety of Conestoga's charge and provides White with a specific method for the disposition of her grievance. *See School Dist. of*

*Borough of West Homestead,* 440 Pa. at 118, 269 A.2d at 907. Specifically, under Sections 744(b) and 749, as a person who considers herself "aggrieved" by the "application" of a title insurer's rating system, White has the right to: ask the Company to review the manner by which it applied its rating system, *see* 40 P.S. § 910–44(b); request that the Commissioner reverse or affirm, if affected by the Company's decision, *see id.;* pursue her position before the Commissioner under the procedures the Administrative Agency Law provides, if aggrieved by his "action," *see id.* § 910–49(a); and seek review in a court of law under the Administrative Agency Law, if aggrieved by the Commissioner's "adjudication" of the matter. *See id.* § 910–49(b); 2 Pa.C.S.A. §§ 101, 702(a); *see generally supra* pp. 505–06, 53 A.3d pp. 724–25 and note 9.[22] Accordingly, as the TIA provides White with a statutory remedy, Section 1504's exclusivity rule is ostensibly triggered.

Moreover and significantly, our review of the TIA reveals nothing to demonstrate, either expressly or by implication, that the General Assembly intended the framework set forth in Sections 744(b) and 749 for addressing a rate application dispute between a title insurer and an insured to coexist with common law claims. While the General Assembly indicated its intent, in Section 748 of the TIA, to override the reluctance historically displayed by the courts to impose cumulative penalties—specifically, with respect to the Commissioner's authority, *see supra* note 12—it did not indicate a corresponding intent, anywhere in the statute, to override the rule it articulated in Section 1504 of the SCA regarding the exclusivity of statutory remedies, or this Court's jurisprudence in this area. *See Geffen v. Baltimore Markets,* 325 Pa. 509, 516, 191 A. 24, 28 (1937) (explaining that the courts are loath to permit cumulative penalties, but, where it is plainly the intention of

22. As the SCA instructs, except for terms of art or terms that have been given an applicable definition, we construe the words in Section 744(b) and Section 749 according to their common and approved usage. *See* 1 Pa.C.S.A. § 1903. We construe "action" to mean "something done or performed;" "aggrieved" to mean "wronged, offended, or injured;" and "application" to mean "the act of putting to a special use or purpose." Random House, Webster's Unabridged Dictionary, 20, 39, 102 (2nd Edition 1998).

the legislature, they will do so). Furthermore, we have deter-
mined that the presence of the word "may" in Section 744(b)
does not alone provide a basis to disregard Section 1504's
plain meaning, nor, as we have discussed, does White's filing
of a class action complaint, in and of itself, negate Section
1504's operation. *See School Dist. of Borough of West Home-
stead,* 440 Pa. at 119, 269 A.2d at 907–08; *Lilian,* 467 Pa. at
21, 354 A.2d at 253.

Further, White does not present any reasons we have found
sufficient to excuse a litigant from exhausting the administra-
tive remedy the legislature has provided. White's contention
that the TIA's remedy is inadequate and need not be exhaust-
ed because Conestoga is unable or unwilling to comply with
the administrative review process in a meaningful way is
unavailing. As we noted, in *School Dist. of Borough of West
Homestead, supra,* we determined that such a complaint may
be raised and addressed during the administrative process and
does not render the administrative remedy inadequate. 440
Pa. at 119, 269 A.2d at 907–08. Moreover, taking account of
the specific allegations made in Counts I and II of her
complaint, while White alleges that Conestoga systematically
overcharged its customers for title insurance, she is asserting
only that Conestoga applied the wrong rate. She does not
assert that there exists a substantial question of constitutional
import concerning the validity of the TIA's administrative
process, claim that Conestoga lacked the authority to apply its
rate structure in the first place, or demonstrate that the TIA's
administrative process is substantially defective or otherwise
ill-suited to resolve the legal issues presented and provide
relief to those who show that Conestoga charged them a
higher premium than it was legally entitled to collect.

Therefore, we conclude that Section 1504's exclusivity of
statutory remedy rule must be applied to Counts I and II of
White's complaint in the instant action. Accordingly, we hold
that White is precluded from pursuing the common law claims
for money had and received and for unjust enrichment she
asserted against Conestoga in the common pleas court.

■ But, the same cannot be said for the claim White asserted against Conestoga in Count III of her complaint pursuant to the UTPCPL. Under the clear and explicit words of Section 1504, the availability of an exclusive statutory remedy forecloses a *common law* cause of action; however, the existence of any such statutory remedy does not foreclose a distinct *statutory* cause of action. *See School Dist. of Borough of West Homestead,* 440 Pa. at 118, 269 A.2d at 907. A UTPCPL claim is a statutory creation of the General Assembly; it does not arise under the common law. *See* 73 Pa.S.A. § 201–9.2. Therefore, Section 1504, by its terms, does not apply to White's UTPCPL claim. Accordingly, on this basis, and in contrast to White's common law claims, we hold that the court of common pleas may adjudicate her UTPCPL claim.[23]

On these distinct grounds, that part of the Superior Court's order reversing the trial court's order as to White's UTPCPL claim and remanding for further proceedings is affirmed, and, accordingly, that claim may be adjudicated in the trial court; furthermore, for the reasons expressed above, that part of the Superior Court order's reversing the trial court's order as to White's common law claims for money had and received and for unjust enrichment is reversed, and accordingly, those claims may not be adjudicated in the trial court.[24, 25]

Jurisdiction relinquished.

**23.** We do not address the Superior Court's reasons as to why, under Section 1504, the TIA's remedy does not foreclose White's UTPCPL claim, as the court wholly failed to acknowledge this common law/statutory divide.

**24.** In its Petition for Allowance of Appeal, Conestoga did not request review of the Superior Court's application of the doctrine of primary jurisdiction in the instant case or of the related instruction the court gave to the trial court on remand under the doctrine. *See supra* pp. 9–10. We, therefore, do not address the Superior Court's decision in this regard.

**25.** On August 22, 2011, Conestoga filed an "Application for Leave to File Post–Submission Brief Pursuant to Rule 2501(a) to Inform the Court of a Pertinent New Decision of Another State's Highest Court." In its Application, Conestoga asks that we permit submission of the decision rendered by the Maryland Supreme Court in *Carter v. Huntington Title & Escrow, LLC,* 420 Md. 605, 24 A.3d 722 (2011), on the issue

Justice ORIE MELVIN did not participate in the decision of this case.

Justices SAYLOR, BAER and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion with the exception of that which I believe to be *dicta* in footnotes 10 and 11. For the reasons that follow, I respectfully disagree with the Majority's decision to speak broadly regarding aspects, not implicated or briefed in this appeal, of the nature and application of Section 1504 and the judicial doctrine of administrative exhaustion.

Here, this Court granted review to decide whether:

In reversing the Common Pleas Court's dismissal of this action for lack of jurisdiction by reason of the administrative remedy provided by the TICA at 40 P.S. § 910–44(b), did the Superior Court err by holding that the statutory and decisional rule that adequate administrative remedies are exclusive does not apply to consumer class actions?

*White v. Conestoga Title Ins. Co.*, 606 Pa. 50, 994 A.2d 1083 (2010) (*per curiam*). The Majority also states that it would address other grounds on which the Superior Court based its decision, *see* Maj. Op. at 514–15 n. 17, 53 A.3d at 730–31 n. 17, presumably because the Court could affirm on such other grounds. *Id.* at 509–11, 53 A.3d at 727–28 (describing Superior Court's decision).

The several issues addressed in footnotes 10 and 11, however, are not among the specific bases on which the Superior Court decided the matter and, indeed, are ostensibly outside the grant of allowance of appeal. In footnote 10, the Majority begins by citing appellant's position that any distinction be-

presented. Conestoga does not, however, allege any modification or reversal of authority relied on by either party that would necessitate the submission of this decision. *See* Pa.R.A.P. 2501(a), (b). Accordingly, Conestoga's Application is hereby denied. *See Stimmler v. Chestnut Hill Hosp.*, 602 Pa. 539, 566 n. 20, 981 A.2d 145, 161 n. 20 (2009).

tween the directive of Section 1504 and the judicial doctrine of administrative exhaustion is "immaterial" in this matter. The Majority, without challenging appellant's view, undertakes a lengthy discussion intended "to clarify" the question of whether such a distinction does or should exist, including in its discussion criticism of an existing case. The Majority describes the interplay between Section 1504 and the judicial doctrine of administrative exhaustion, holds that they are one legal consideration, and lists seemingly settled jurisprudential exceptions to the general rule. *See* Maj. Op. at 506–07 n. 10, 53 A.3d at 725–26 n. 10. Subsequently, the Majority concludes that appellee—the plaintiff below—has not in her complaint, and does not on appeal, rely on any such exception to argue the inapplicability of Section 1504. *Id.* at 522–24, 53 A.3d at 735–36.

Meanwhile, in footnote 11, the Majority discusses whether Section 1504 is jurisdictional or prudential and collects cases which ascribe to either one or the other view. The Majority suggests that the distinction may be relevant to whether the Court could address the issue *sua sponte.* Ultimately, however, the Majority concludes that the conflict need not be resolved because appellant preserved the issue for appeal, and fails to offer any other purpose for its observations. *Id.* at 507–08 n. 11, 53 A.3d at 726–27 n. 11.

This Court has suggested that we lack jurisdiction to decide issues outside the scope of the allowance of appeal granted. *See Commonwealth v. Jones,* 530 Pa. 536, 610 A.2d 439, 440 n. 2 (1992), *abrogated on other grounds by Commonwealth v. Deemer,* 550 Pa. 290, 705 A.2d 827 (1997). Strict enforcement of that proposition is perhaps an impossible task, and, in my view, there may be perfectly good reasons for the Court to reach out and offer guidance beyond points actually accepted and briefed. Indeed, it has been my position that "the question of what issues are properly reachable in an appeal is a prudential matter, not an absolute, and it is not surprising that the members of the Court, reasonably and in good faith, may reach different conclusions when presented with a particular factual and legal matrix." *Freed v. Geisinger Med. Ctr.,* 607 Pa. 225, 5 A.3d 212, 219 (2010) (Castille, C.J., concurring).

Here, inquiries regarding the jurisdictional or jurisprudential nature of Section 1504 and the broader question of exceptions to the exclusive remedy/exhaustion consideration are collateral to the actual dispute. The Majority engages these issues after simply noting appellant's uncertainty regarding a related question on the interplay between Section 1504 and the judicial doctrine of administrative exhaustion. The Majority offers no insight either into any interest by the parties in pursuing the broader issues it addresses in footnotes 10 and 11, grants the parties no opportunity to brief the relevant points, and does not explain the necessity for the *dictum*.

In this particular situation, I believe that the perceived necessity for clarification is not sufficient to overcome prudential concerns in addressing points outside the scope of a discretionary appeal. *Accord Harsh v. Petroll,* 584 Pa. 606, 887 A.2d 209, 216 n. 16 (2005) ("While we acknowledge amicus's points in these regards and the desirability of additional clarification, the points are outside the scope of this limited appeal."). The parameters of the exhaustion doctrine (whether statutory or prudential) are of sufficient complexity, and the factual circumstances giving rise to exhaustion issues of sufficient variety, that I would not speak broadly or correctively in the area unless in the context of a case where we have a focused issue and targeted advocacy along those lines.

For example, footnote 10 lists the exceptions to Section 1504 in cases where the administrative remedy: "was unable to address the legal issues presented and effectively provide relief to all those in a position to seek it and presented a substantial question of constitutional import or would result in duplicative and piecemeal litigation likely to yield inconsistent results, or would lead to irreparable harm." Maj. Op. at 508 n. 10, 53 A.3d at 726 n. 10 (citing, *inter alia, Kowenhoven v. County of Allegheny,* 587 Pa. 545, 901 A.2d 1003 (2006)). Derived by the Majority from caselaw, this mere listing does not capture the multifaceted calculus, of which *Kowenhoven* is illustrative, behind these decisions. In *Kowenhoven,* the majority decision, which I joined, excused compliance with Section 1504 to address a question of great constitutional impor-

tance and avert the need for a multiplicity of duplicative lawsuits on the single, controlling legal question presented. However, as a general matter, I would not consider duplicative litigation or, separately, the simple presentation of a constitutional question sufficient grounds to bypass the salutary function of the administrative process. *Cf. Elgin v. Dep't of Treasury,* —— U.S. ——, 132 S.Ct. 2126, 2138, 183 L.Ed.2d 1 (2012) ("[W]e see nothing extraordinary in a statutory scheme that vests reviewable factfinding authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question[, such as the constitutional claim at issue,] to which the facts pertain."). Accordingly, I am reticent to draw broad and non-fact specific lines of demarcation regarding instances in which the Court should find an exception to the exhaustion of administrative remedies requirement. I respect that the Majority may intend its comments to be a mere recitation or a compilation of relevant sources of settled law, but they are likely to be advanced by litigants, and cited by lower courts, as broadly deciding various issues that I, for one, believe may warrant deeper consideration.

For these reasons, I join the Majority Opinion subject to this one articulated reservation.

Justice EAKIN joins this opinion.