# [J-74-2018]

## IN THE SUPREME COURT OF PENNSYLVANIA
## WESTERN DISTRICT

| | |
|---|---|
| COUNTY OF BUTLER,<br><br>        Appellee<br><br><br>        v.<br><br>CENTURYLINK COMMUNICATIONS, LLC, AND ALL SUBSIDIARIES AND RELATED ENTITIES; THE UNITED TELEPHONE COMPANY OF PENNSYLVANIA LLC, AND ALL SUBSIDIARIES AND RELATED ENTITIES; CONSOLIDATED COMMUNICATIONS OF PENNSYLVANIA, LLC, AND ALL SUBSIDIARIES AND RELATED ENTITIES; CONSOLIDATED COMMUNICATIONS ENTERPRISE SERVICES, INC., AND ALL SUBSIDIARIES AND RELATED ENTITIES; CORE COMMUNICATIONS, INC., AND ALL SUBSIDIARIES AND RELATED ENTITIES; INTERMEDIA COMMUNICATIONS OF FLORIDA, INC., AND ALL SUBSIDIARIES AND RELATED ENTITIES; VERIZON PENNSYLVANIA, INC., AND ALL SUBSIDIARIES AND RELATED ENTITIES; LEVEL 3 COMMUNICATIONS, LLC, AND ALL SUBSIDIARIES AND RELATED ENTITIES; TELCOVE OF EASTERN PENNSYLVANIA, AND ALL SUBSIDIARIES AND RELATED ENTITIES; AT&T CORP., AND ALL SUBSIDIARIES AND RELATED ENTITIES; TELEPORT COMMUNICATIONS AMERICA, LLC, AND ALL SUBSIDIARIES AND RELATED | : No. 66 WAP 2017<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court entered on 6/8/17<br>: at No. 1506 CD 2016, reversing the<br>: order of the Court of Common Pleas of<br>: Butler County entered on 8/11/16 at No.<br>: 15-11007 and remanding<br>:<br>:<br>:<br>:<br>:<br>: ARGUED:  October 23, 2018<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

ENTITIES; US LEC OF PENNSYLVANIA, :
LLC, AND   ALL SUBSIDIARIES AND :
RELATED ENTITIES; BANDWIDTH.COM :
CLEC, LLC, AND ALL SUBSIDIARIES :
AND RELATED ENTITIES; COMCAST :
PHONE OF PENNSYLVANIA, LLC, AND :
ALL SUBSIDIARIES AND RELATED :
ENTITIES; PEERLESS NETWORK OF :
PENNSYLVANIA, LLC, AND ALL :
SUBSIDIARIES AND RELATED :
ENTITIES; AND ABC COMPANIES 1 :
THROUGH 20, :
                                                      :
                      Appellants          :

*OPINION*

**CHIEF JUSTICE SAYLOR**                    **DECIDED:  APRIL 26, 2019**

This issue accepted for review concerns whether counties may advance common law claims seeking legal redress against telecommunications companies for alleged deficiencies in their administration of fees associated with 911 emergency communication services.

**I.  Background**

In 1990, the Pennsylvania General Assembly created a statutory scheme regulating 911 emergency communication services throughout the Commonwealth.[1] Per the enactment, counties bore the responsibility to operate 911 systems within their jurisdictions.  *See* 35 Pa.C.S. §5304(a)(1) (requiring each county to develop a plan for "the implementation, operation and maintenance of a 911 system") (superseded); *see*

---

[1] *See* Act of July 9, 1990, P.L. 340, No. 78 (as amended 35 Pa.C.S. §5301-5312.1) (superseded) (the "911 Act" or the "Act").

*also id.* §5301, Historical and Statutory Notes (quoting Act of July 9, 1990, P.L, 340, No. 78, Preamble).[2]  In this vein, each county was obliged to make arrangements with telephone companies providing local exchange telephone service within its boundaries to provide 911 service.  *See* 35 Pa.C.S. §5304(a)(2) (superseded).  The Act also extended to Interconnected Voice over Internet Protocol ("VoIP") services.  *See id.* §5311.14 (repealed).

The enactment also contemplated the creation of a stream of funding to counties for 911 systems via the imposition of a monthly assessment or charge upon telephone-service customers in an amount denominated as the "contribution rate," *see, e.g.*, *id.* §5305(g.1)(1) (superseded), as well as a specified fee attached to VoIP service, *see id.* §5311.14 (repealed).  Service providers were required to collect these fees from customers and remit the proceeds to county treasurers.  *See id.*; *see also id.* §5307(a)(1) (superseded).[3]  Providers, however, were expressly relieved of any obligation to take legal action to collect charges, as follows:

> The local exchange telephone company shall not be required to take any legal action to enforce the collection of any charge imposed under this chapter.  Action may be

[2] This litigation pertains to matters occurring prior to the introduction of a series of amendatory provisions into the 911 Act in 2015.  *See* Act of June 29, 2015, P.L. 36, No. 12.  Consequently, references herein are to the pre-amendment version of the enactment.

[3] A significant modification worked by the 2015 amendments was to redirect these remunerations to the State Treasurer for deposit in a special fund dedicated to 911 services throughout the Commonwealth and administered by PEMA.  *See* 35 Pa.C.S. §5307(a)(1); *see also id.* §5306.1 (providing for the creation of the fund and delineating the use and distribution of monies deposited therein).

Parenthetically, the Commonwealth Court offered further insight into this and other significant changes to the 911 Act in its opinion in this case.  *See County of Butler v. CenturyLink Commc'ns, LLC*, 163 A.3d 504, 506 n.1 (Pa. Cmwlth. 2017).

brought by or on behalf of the public agency imposing the charge.

*Id.* §5307(e)(1) (superseded).

From the state level, the scheme was overseen by the Pennsylvania Emergency Management Agency ("PEMA"), which was specifically empowered to "take the actions necessary to implement, administer and enforce" the 911 Act. *Id.* §5303(a)(12) (specifying the "[p]owers and duties" of the agency) (superseded). The enactment otherwise reaffirmed that, in addition to any powers otherwise expressly enumerated in the 911 Act, PEMA:

> has the power and duty to enforce and execute, by its regulations or otherwise, this chapter. The agency may institute injunction, mandamus or other appropriate legal proceedings to enforce [the 911 Act and associated regulations].

*Id.* §5311.13 (captioned "Enforcement") (repealed).

In April 2016, Appellee, the County of Butler, filed a complaint against Appellant, CenturyLink Communications, LLC, and other telecommunications companies (collectively, "Providers"), contending that they failed to fulfill their responsibilities under the 911 Act prior to August 1, 2015. Specifically, the County alleged that Providers did not adequately charge customers or collect, remit, or report certain fees due to the County. In particular, the County complained that Providers' facilities accommodate multiple lines on a single physical exchange line and/or offer packetized services but that Providers failed to levy a fee for the use of each line, especially for business customers employing multiple lines. The complaint advanced common law causes of action sounding in breach of fiduciary duties, fraud, and negligent misrepresentation and sought injunctive relief, monetary damages, and an accounting. Notably, the County did not advance a pure statutory enforcement claim premised exclusively on authority conferred by the 911 Act.

Providers filed joint preliminary objections in the nature of a demurrer. They contended, *inter alia*, that the 911 Act invests exclusive enforcement authority in PEMA, and accordingly, that the County was barred from bringing the action. From the outset, Providers asserted that a longstanding and unbroken series of decisions of this Court maintain that, where the Legislature confers express enforcement rights in a statute, those rights must be deemed exclusive, and no other enforcement rights may be read into the statute or otherwise advanced via the assertion of common law claims. *See, e.g.*, Defendants' Joint Preliminary Objections in *County of Butler v. CenturyLink Commc'ns, LLC*, AD No. 15-11007 (C.P. Butler), at ¶3 (citing *White v. Conestoga Title Ins. Co.*, 617 Pa. 498, 522, 53 A.3d 720, 735 (2012)).

The County responded with the argument that the 911 Act does not either establish an exclusive enforcement power in PEMA or otherwise preclude the County from pursuing common law causes of action. They also posited that the segment of Section 5307(e)(1) providing that "[a]ction may be brought by or on behalf of the public agency imposing the charge" expressly empowered counties to bring actions to enforce the collection of fees against service providers. 35 Pa.C.S. §5307(e)(1) (superseded).

The common pleas court credited Providers' position. *See County of Butler v. CenturyLink Commc'ns, LLC*, AD No. 15-11007, *slip op.* at 10 (C.P. Butler Aug. 11, 2016) (Horan, J.) (concluding that "PEMA has the exclusive statutory power and duty to regulate and enforce the 911 Act against service providers"). With respect to Section 5307(e)(1), the court explained that the provision confers a right upon counties to collect a "charge" from non-paying customers, but not from service providers. *See id.* at 6-7. In this regard, the court stressed that no "charges" are imposed on service providers under the 911 Act. *See id.* at 7.

The common pleas court also commented on the complexity of telecommunications management in relation to telephone subscribers and fees per the Act and the concomitant desirability of consistency and predictability across county lines. *See id.* at 7-8. As such, in the court's view, "a single source of guidance is appropriate." *Id.* at 8. It is for this reason, the court believed, that the Legislature conferred standing and exclusive authority upon PEMA to enforce the provisions of the Act relative to service providers. *See id.*

In terms of the County's attempt to advance common law claims, the county court found those claims to be barred per Section 1504 of the Statutory Construction Act, which provides:

> In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by any statute, the directions of the statute shall be strictly pursued, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying such statute into effect.

1 Pa.C.S. §1504. The court proceeded to discuss this Court's admonition, for example, in *White*, that, "'[w]here a statutory remedy is provided, the procedure prescribed therein must be strictly pursued to the exclusion of other methods of redress;' but, where the legislature explicitly reveals in a statute that it does not intend for such exclusivity, a statutory procedure for dispute resolution does not preempt common law claims." *White*, 617 Pa. at 519, 53 A.3d at 733 (quoting *Jackson v. Centennial Sch. Dist.*, 509 Pa. 101, 105, 501 A.2d 218, 220 (1985), and *DeLuca v. Buckeye Coal Co.*, 463 Pa. 513, 519, 345 A.2d 637, 640 (1975)).

As is presently relevant, the common pleas court found no evidence, in the 911 Act, of an intention for PEMA's enforcement authority to be shared. Indeed, the court discerned much contrary evidence in the statute, principally from the fact that Providers'

obligation to collect and remit fees is created exclusively by the Act, *see* 35 Pa.C.S. §5307(a) (superseded), and from the enactment's explicit repositing of enforcement power over this statutory duty in PEMA, *see id.* §§5303(a)(12) (superseded), 5311.13 (repealed).

After the common pleas court issued its decision, the County submitted a motion for reconsideration presenting, for the first time, an affidavit from Robert Mateff, who was PEMA's Deputy Director for 911 Services. Mr. Mateff attested that it was the agency's position that, "[w]hile PEMA had other responsibilities under the 911 Act that it would enforce if necessary, the setting and monitoring of 911 surcharge fees for wireline and VoIP services was not one of them." Affidavit of Robert F. Mateff, Sr., dated Aug. 30, 2016, in *CenturyLink*, AD No. 15-11007, at ¶15. According to the affidavit, Section 5307(e)(1) conferred a right in the counties to pursue legal actions against service providers related to the collection and remittal of 911 fees. *See id.* at ¶¶12-13 ("PEMA has always interpreted Section 5307(e)(1) to authorize the counties to police the telephone companies['] collection practices."). Mr. Mateff related that PEMA lacked any interest in the funds collected by service providers and stated that the agency's interest was instead with how counties were expending the money that they received from 911 fees. *See id.* at ¶14. He also highlighted PEMA's lack of any statutory audit or other investigatory powers that could be exercised against telephone providers. *See id.* at ¶8.

The common pleas court rejected the affidavit, finding that it could not dictate a judicial ruling on a matter of statutory interpretation. *See CenturyLink*, AD No. 15-11007, *slip op.* at 3-4 (C.P. Butler Nov. 2, 2016). The court also appeared to be troubled by Mr. Mateff's downplaying of PEMA's wide range of responsibilities under the 911 Act. *See id.* at 4; *see also* N.T., Sept. 8, 2016, at 27 (reflecting the common pleas

judge's remark that the "PEMA Affidavit fails to address the very significant provisions of the Act that empower PEMA and give PEMA broad authority to regulate and enforce").

In its motion for reconsideration, the County also argued, for the first time, that it was invested with due process rights that would be violated if it did not have the right to sue service providers for damages under the 911 Act. The common pleas court likewise disapproved this position, reasoning that the enactment simply did not grant enforcement authority, relative to service providers, to the counties, "and there were no property rights created for the counties to enforce as against service providers." *CenturyLink*, AD No. 15-11007, *slip op.* at 4 (C.P. Butler Nov. 2, 2016).

On appeal, the Commonwealth Court reversed in a published decision. *See CenturyLink*, 163 A.3d 504. The panel initially agreed with Providers and the county court concerning various matters of statutory interpretation presented. For example, regarding Section 5307(e), the court reasoned:

> We read former Section 5307(e) . . . as only having referred to the *collection* of the 911 fees after the service provider had billed the subscriber. Former Section 5307(e) was silent, however, as to *billing*. Stated otherwise, former Section 5307(e) did not address a situation where a telecommunication service provider failed to bill the subscriber or undercharged the subscriber.

*Id.* at 509 (emphasis in original). The panel also concurred with the common pleas court's rejection of Mr. Mateff's affidavit, concluding that the document was entitled to no deference. *See id.* at 510 n.7 ("The County does not cite to a single case, nor is this Court aware of any, in support of the position that courts should grant deference to an affidavit by a single employee of an administrative agency in civil litigation, particularly, litigation in which the agency is not a part.").

The panel, however, was not persuaded that the conferral of authority upon PEMA to enforce the 911 Act was exclusive and precluded the County from bringing

suit. In this regard, the panel observed that PEMA's, counties', and service providers' roles and responsibilities under the statutory scheme differ. While PEMA may enforce the 911 Act, the panel opined, counties may also seek direction from courts as to their roles in relation to PEMA and service providers. The panel concluded that, at a minimum, counties are entitled to a court ruling on legal disputes. *See id.* at 510.

In holding that PEMA's authority was nonexclusive, the panel took the opportunity to examine *Petty v. Hospital Service Association of Northeastern Pennsylvania*, 611 Pa. 119, 23 A.3d 1004 (2011), which held that that policyholders and subscribers who had purchased medical insurance from a nonprofit corporation lacked standing to maintain an action against the corporation under the statutory regime governing nonprofit corporations. Distinguishing *Petty*, the panel couched the injury alleged by the County in the present case as a "direct harm" and a "specific harm" impacting the County's ability to meet its obligations under the 911 Act, while noting that the enactment did not specifically preclude the County from pursuing an action. *See CenturyLink*, 163 A.2d at 512.

This appeal was allowed on Providers' petition to consider the following question:

> When the General Assembly plainly and unambiguously grants the right to enforce a statute to a particular Commonwealth agency, may a different plaintiff circumvent this legislative directive by attempting to enforce the statute through common-law damages claims?

*Cnty. of Butler v. CenturyLink Commc'ns*, LLC, ___ Pa. ___, 176 A.3d 852 (2017) (*per curiam*). Our review of this legal issue is plenary. *See, e.g., Yussen v. MCARE Fund*, 616 Pa. 108, 117, 46 A.3d 685, 691 (2012).

In terms of the issue that was accepted by this Court for review, Providers strongly differ with the Commonwealth Court's determination concerning the viability of common law claims. *See, e.g.*, Brief for Appellants at 2 ("When the General Assembly

provides an express enforcement mechanism in a statute -- as it did in the 911 Act -- a court may not create additional enforcement mechanisms."); *see also id.* at 25 ("This Court has long recognized that it is the General Assembly's prerogative to decide how its statutes shall be enforced."). Providers claim that the strong weight of the prevailing authority vindicates their position. *See, e.g., id.* at 15 ("For over 200 years, Pennsylvania courts have held that, when the legislature expressly provides a means of enforcing a statute, a party may not subvert that decision by trying to enforce the statute through the common law."). They also continue to stress the prohibitory language of Section 1504 of the Statutory Construction Act. *See* 1 Pa.C.S. §1504.

Responding to the intermediate court's reliance on the absence of any prohibitory language in the 911 Act itself, Providers charge that this analysis "turns Pennsylvania law on its head." Brief for Appellants at 30. They contend that Pennsylvania law holds that statutory remedies are presumed to be exclusive unless "the legislature explicitly reveals in a statute that it does *not* intend for such exclusivity." *Id.* (quoting *White*, 617 Pa. at 519, 53 A.3d at 733) (emphasis in original).

Turning to the panel's discussion of the County's obligations under the 911 Act and its assertions of "direct harm" and "specific harm" arising from Providers' alleged violations of the statute, Providers' explain that "[t]he violation of a statute and the fact that some person suffered harm does not automatically give rise to a private cause of action in favor of the injured person." *Id.* at 3 (quoting *Estate of Witthoeft v. Kiskaddon*, 557 Pa. 340, 348, 733 A.2d 623, 627 (1999)); *see also id.* at 32 ("While allegations of a direct injury may be *necessary* for a plaintiff to establish *standing*, they are not *sufficient*, as *Witthoeft* makes clear, for that plaintiff to have a *right of action* to enforce a statute." (emphasis in original; citation omitted)). According to Providers, the harm alleged by the County is no more direct or specific than injuries asserted in the many cases in

which Pennsylvania courts have held that a plaintiff cannot sue because the plaintiff lacks statutory enforcement rights. *See id.* (citing*, inter alia*, *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.*, 494 Pa. 501, 511, 431 A.2d 966, 972 (1981) (holding that a policyholder could not sustain an action against an insurance company based on an allegation that emotional distress was caused by a bad-faith denial of an insurance claim)).

Providers further criticize the Commonwealth Court's decision to narrow its focus to the *Petty* decision and maintain that the County lacks any constitutional right to enforce the 911 Act. As to policy, they argue:

> This case exemplifies the need for uniform administration of the 911 Act. The central substantive issue in this lawsuit (and [in] other county lawsuits) is that the pre-amendment 911 Act was silent as to how it applies to modern telecommunications technologies that enable a single physical line to transmit multiple telephone calls at once. The General Assembly intended for PEMA to be able to fill such gaps through regulations, which would provide prospective guidance to the industry. Nothing in the 911 Act confers on each of Pennsylvania's 67 counties the authority to try to exploit legislative silence by bringing common law suits against an entire industry. As the Court of Common Pleas correctly held, the General Assembly avoided this unworkable result by "confer[ing] standing and exclusive authority upon PEMA to enforce the provisions of the 911 Act, in relation to service providers." Under the Commonwealth Court's holding, in contrast, each of Pennsylvania's counties is free to interpret the Act for itself. This sort of patchwork enforcement of the 911 Act is the opposite of what the General Assembly provided.

*Id.* at 40-41 (citations omitted). In terms of the allusion to "patchwork enforcement," Providers relate that the instant case is presently one of sixteen lawsuits that counties have brought against more than eighty telephone companies throughout the state. *See id.* at 1.

According to Providers, the General Assembly's decision to impose on telephone companies a statutory obligation to bill, collect, and remit 911 taxes and to select a specific government entity to enforce that obligation raises no due process concerns. In any event, Providers deem the constitutional argument to have been waived, as it was raised by the County for the first time in a motion for reconsideration before the court of common pleas.

Providers' *amici*, the Chamber of Commerce of the United States of America and the Pennsylvania Chamber of Business and Industry, also express concerns about exposing telecommunications companies that are involuntarily enlisted to assist local governments to disparate litigation in 67 counties across the Commonwealth. Further, *amici* find the Commonwealth Court's focus on the directness of relationships and harm to be too amorphous to serve as a governing standard. To the contrary, *amici* urge the decision as to where enforcement authority lies belongs to -- and for present purposes has been made by -- the General Assembly.

Finally, Providers take the opportunity to defend the Commonwealth Court's and the county court's interpretation of Section 5307(e)(1), as well as their treatment of Mr. Mateff's affidavit.[4]

---

[4] Notably, the issue of statutory construction and the related matter of administrative-agency deference were decided favorably to Providers at all previous stages of this litigation, and the County did not lodge a cross-petition for allowance of appeal to contest those determinations. These matters are also facially outside the scope of the issue advanced in Providers' petition for allowance of appeal and accepted for review, which quite naturally is directed to the portion of the Commonwealth Court's decision that was adverse to Providers as petitioners and appellants. *See CenturyLink*, ___ Pa. at ___, 176 A.3d at 852.

Nevertheless, commencing with the filing of its complaint, the County has intermittently blended the statutory and common law theories in issue in this case. For example, as noted, the County did not advance a pure statutory enforcement count in its complaint, and thus, it arguably was not aggrieved by the intermediate court's ruling on statutory (continued…)

The County, on the other hand, criticizes the intermediate and county courts' assessment of Section 5307(e)(1), maintaining that the statute expressly invested authority in counties to enforce service providers' obligations relative to the collection of fees due under the 911 Act. In this regard, the County continues to rely upon Section 5307(e)(1)'s prescription that "[a]ction may be brought by or on behalf of the public agency imposing the charge." 35 Pa.C.S. §5307(e)(1) (superseded). The County highlights that "action," in this passage, harkens back to the statute's previous reference to "legal action *to enforce the collection of any charge imposed under this chapter*," *id.* (emphasis added); and that the "chapter" in question encompasses Section 5307, governing county-imposed fees for traditional wireline service, as well as Section 5311.14, providing for fees associated with VoIP services. It is the County's position that it properly brought a legal action to enforce the collection by Providers of 911 fees imposed under the relevant chapter of the 911 Act.

The County further contends that other provisions of the 911 Act also reflect its authority to bring the present action. For example, the County explains that Section 5307(e)(3) accorded immunity to telephone service providers from lawsuits for uncollectible 911 fees. The County posits, however, that no such immunity would be necessary were providers not otherwise subject to such suits. Additionally, the County

---

(…continued)
interpretation and agency deference (given that all counts of the complaint remained extant). Furthermore, the issue of statutory construction is an important one, particularly given that we are advised that the present action is one of sixteen parallel proceedings arising in various counties across the Commonwealth. Moreover, the litigants on both sides have amply developed the respective positions on the matters. And finally, as reflected in Part III, below, our analysis of the statutory and common-law questions overlaps greatly, centering on legislative intent relative to enforcement. Accordingly, we will address these questions on their terms.

notes that immunity only extended to "uncollectible amounts," 35 Pa.C.S. §5307(e)(3) (superseded), but there was no protection afforded relative to amounts that were collectable. *See* Brief for Appellee at 16 ("The logical implication, then, is that the General Assembly intended to permit lawsuits against service providers for failure to collect and remit *collectible* amounts." (emphasis added)). According to the County, Providers' contrary interpretation disregards the presumption that the Legislature intended for all of the 911 Act to be effective. *See* 1 Pa.C.S. §1922(2).

The County also observes that, when the Legislature drafted the 911 Act, it assigned defined terms to connote telephone companies' customers, *i.e.*, "telephone subscribers" and "VoIP service customers." 35 Pa.C.S. §5302 (superseded). The County emphasizes that neither of these terms appeared in Section 5307(e)(1), thus, in its view, undercutting the interpretation of the Commonwealth Court and the county court. *See* Brief for Appellee at 18-19 ("If the legislature wanted to limit the County's enforcement power to lawsuits against [Providers'] customers, it would have used the terms that it defined.").

Further, the County relates that, in other parallel actions, several common pleas courts have resolved preliminary objections favorably to local governments. The County posits that the disparate treatment at the county-court level supports the conclusion that Section 5307(e)(1) was ambiguous, and it maintains that any such ambiguity should be resolved in favor of PEMA's interpretation as reflected in Mr. Mateff's affidavit.

Additionally, the County purports to have the better position in terms of public policy. In this regard, it urges that "it would be unreasonable to conclude that the General Assembly intended to burden the County with the obligation to provide emergency services throughout its jurisdiction, yet leave the County powerless to enjoin

and remedy significant interference with its ability to fund and provide those crucial public services." Brief for Appellee at 21.

To the extent that this Court would determine that the 911 Act did not authorize the present lawsuit, the County asserts that the action remains viable based on the contention that the 911 Act vested a constitutionally-protected property right in the County. According to the County, Section 1504 can only apply to foreclose common law actions if the General Assembly has created a remedy that is specific, exclusive, and constitutionally adequate. *See* Brief for Appellee at 30 (citing *Sch. Dist. of Borough of W. Homestead v. Allegheny Cty. Bd. of Sch. Directors*, 440 Pa. 113, 118, 269 A.2d 904, 907 (1970)). The County argues that subjugation to the discretion of an administrative agency is an inadequate remedy, as evidenced by PEMA's apparent disinterest in the subject matter of the present litigation. In these regards, the County also invokes the canon of constitutional avoidance. *See* 1 Pa.C.S. §1922(3) (codifying the presumption that "the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth").

The County again cross-references other provisions of the 911 Act, this time as demonstrating an implied enforcement power, to the degree that the Court would not find an express one. For example, the County explains that Section 5304 of the 911 Act provided that counties could execute "contracts, mutual aid agreements, cross-service agreements and all other necessary documents which may be required in the implementation of the county plan." 35 Pa.C.S. §5304(a)(5) (superseded). Although the 911 Act did not expressly authorize counties to *enforce* such contracts, agreements, or other documents, the County asserts that such authority necessarily derives from the structure of the 911 Act. *See* Brief for Appellee at 31.

Responding to the decisions referenced by Providers, the County indicates:

> None of those cases involved a statutory framework that imposed mandatory obligations on the plaintiff; none involved a statutory framework that granted the plaintiff some express enforcement authority; and none involved a situation where the state agency allegedly possessing exclusive enforcement authority under the statute declared that the plaintiff did, in fact, have enforcement authority and that the state agency had no interest in vindicating the plaintiff's rights.

Brief for Appellee at 36. Furthermore, the County defends the rationale of the Commonwealth Court on its terms and argues that acceptance of Providers' arguments would leave the County without any practicable and effective remedy. *Accord id.* at 1 ("The rule that [Providers] propose would convert the General Assembly's legislative enactment from a funded mandate to an unfunded one.").

Finally, the County and its *amici* -- the Counties of Beaver, Berks, Chester, Clarion, Cumberland, Dauphin, Delaware, Washington, Westmoreland, and York -- rely on a series of cases that stand for the general proposition that, where there is a right, there is also a remedy. *See, e.g.*, *Willcox v. Penn Mut. Life Ins. Co.*, 357 Pa. 581, 600, 55 A.2d 521, 530-31 (1947).

## II. Statutory Construction

The question of whether the 911 Act affords statutory enforcement authority to the County relative to Providers -- like the issue specifically accepted for review -- is one of law, over which this Court's review is plenary. *See Oliver v. City of Pittsburgh,* 608 Pa. 386, 393, 11 A.3d 960, 964 (2011).

## A. Ambiguity in Section 5307(e)(1)

At the outset, we agree with the County's alternative position that Section 5307(e)(1) is ambiguous. On the one hand, contextually, we find that Providers' reading of the statute is the more natural one. *See A.S. v. PSP*, 636 Pa. 403, 418-20, 143 A.3d 896, 905-06 (2016) (stressing the role of context in statutory analysis). Under this interpretation, "[a]ction" in the second sentence -- *i.e.*, "[a]ction may be brought by or on behalf of the public agency imposing the charge," 35 Pa.C.S. §5307(e)(1) (superseded) -- is understood to refer to the type of lawsuit discussed in the first sentence, that is, "legal action to enforce the collection of any charge imposed under this chapter," such as might be taken by the "local exchange telephone compan[ies]" that are the sentence's subject. *Id.* Particularly since it would be unreasonable to presume that such telephone companies would commence legal action against themselves, the passage is most readily understood to address legal action against customers relative to charges for which they are responsible and not actions against service providers in their capacity as collectors involuntarily enlisted per the enactment. *See* 1 Pa.C.S. §1922(1) (codifying the presumption that the General Assembly does not intend a result that is absurd, impossible of execution, or unreasonable).[5]

Nevertheless, the second sentence of Section 5307(e)(1) entails some shorthanding by the Legislature deriving from the first sentence, and the precise predicate envisioned is not entirely clear. Thus, we find that it is possible for the second sentence to be understood to invest broader enforcement authority in counties, as the

---

[5] The County's argument that the immunity that was conferred by Section 5307(e)(3) would be superfluous if counties were not empowered to bring suit overlooks PEMA's uncontested authority to otherwise pursue litigation. In other words, the immunity accorded to Providers has little bearing on the question of *who* might be authorized to pursue action against them, as long as some entity may do so.

"public agenc[ies]" imposing the charges and authorized to bring "[a]ction[s]." 35 Pa.C.S. §5307(e)(1) (superseded).[6] Indeed, as the County reasonably observes, the Legislature could have readily solidified the interpretation of Section 5307(e)(1) advocated by Providers had it employed the defined terms that it devised to connote telecommunication services customers.[7] Given the ambiguity, we will employ tools of statutory construction, *see Oliver*, 608 Pa. at 394, 11 A.3d at 965, albeit that our above assessment of the context remains a substantial factor militating in Providers' favor.

## B. Deference to PEMA

Responding to the dispute concerning whether we should afford deference to PEMA's interpretation of Section 5307(e)(1) -- and while recognizing that the Court may consider administrative interpretations in construing an ambiguous statute, *accord* 1 Pa.C.S. §1921(c)(8) -- we conclude that no deference is due here.

In this regard, we find little persuasiveness in the content of the affidavit. As the common pleas court stressed, under the 911 Act, PEMA was invested with the power *and charged with the duty* to take the actions necessary to implement, administer, and

---

[6] The term "public agency," under the 911 Act, included political subdivisions. *See* 35 Pa.C.S. §5302 (superseded).

[7] The county court's focus on the word "charge" in Section 5307(e)(1) is not completely dispositive, in our view, since the statute addressed "collection" of charges, an activity in which Providers did engage. Moreover, while we agree with the Commonwealth Court that the most natural reading of the statute does not connote billing, the statute does refer to charges "imposed under this chapter," and not only charges appearing on billing statements transmitted to customers by service providers. Accordingly, to the degree that the second sentence of Section 5307(e)(1) can be read to refer back to charges under the statute in the abstract -- rather than such collection activities as might be undertaken by local exchange telephone companies -- it can be understood to encompass broader authorization.

enforce the enactment's provisions. *See* 35 Pa.C.S. §5303(a)(12) (superseded). To this end, PEMA was also afforded the power and, again, tasked with the obligation, to adopt necessary rules and regulations.

PEMA should be no less aware than we are that there are many pending actions by counties alleging that critical local emergency communications services were being substantially underfunded on account of service providers' alleged failures to adhere to requirements of the 911 Act. In our considered judgment, regardless of whether the counties enjoy enforcement authority under the statute, the statute very clearly imposes the obligation squarely upon PEMA. To the degree that PEMA has taken no action to evaluate the allegation of substantial underfunding of emergency communications services, it seems rather clear that the agency is disregarding its duties under its own enabling legislation.[8] Indeed, the agency's position that it has no interest whatsoever in pervasive claims by local government units that critical government services within PEMA's purview are being underfunded in violation of the 911 Act is very difficult to understand.

Finally, the practice of according deference to administrative agencies is premised on respect for the exercise of agency expertise. *See, e.g., Nationwide Ins. Co. v. Schneider*, 599 Pa. 131, 145, 960 A.2d 442, 450 (2008) (citing *Popowsky v. PUC*, 594 Pa. 583, 606, 937 A.2d 1040, 1054 (2007)). Here, Mr. Mateff's affidavit fails to demonstrate an understanding of PEMA's duties under the 911 Act or to offer any sort of persuasive explanation for the agency's position grounded in agency expertise.

---

[8] Certainly, PEMA would have no obligation to take further action should its judgment, after reasonable review, be that service providers were complying with the 911 Act. Mr. Mateff's affidavit, however, offers no suggestion that PEMA has undertaken any such review. Rather, he has explained that it is PEMA's position that the counties should simply be left to their own devices relative to their concerns about the amount of funding collected by the service providers and distributed to the counties.

Accordingly, and again, PEMA's position, as related by Mr. Mateff, will be accorded no deference by this Court.

**C. Other Principles of Statutory Construction Pertaining to Section 5307(e)(1)**

When analyzing an ambiguous statute, a reviewing court is authorized to consider relevant principles of construction, including the occasion and necessity for the statute, the object to be attained, and the consequences of particular interpretations. *See* 1 Pa.C.S. §1921(c)(1), (4), (6). There are also various presumptions that may apply. *See id.* §1922.

In terms of the presumption of exclusivity advanced by Providers,[9] we agree with the County that the cases upon which they rely are more nuanced than Providers portray. For example, Providers' brief repeatedly intermixes statutory enforcement powers of governmental units with statutory remedies made available to individuals who otherwise lack any power of enforcement. *See, e.g.*, Brief for Appellants at 30 (citing *White*, 617 Pa. 519, 53 A.3d at 733, a case emphasizing the exclusiveness of statutory remedies, for the proposition that statutory enforcement powers are also necessarily exclusive). However, we do not read any of the decisions cited by Providers as holding that, when the Legislature selects an enforcement agency to supervise regulation of the statutory scheme at large, the authority is universally exclusive relative to various governmental units which may be involved in discrete matters pertaining within that regime.[10] Although we find this factor (the General Assembly's explicit prescription for

---

[9] The arguments about exclusivity appear in the portion of Providers' brief discussing common law remedies, but they are also relevant to an assessment of Section 5307(e)(1) via principles of statutory construction.

[10] By way of example, Providers cite *Lurie v. Republican All.*, 412 Pa. 61, 192 A.2d 367, 369 (1963), which concerned an attempt by two individual taxpayers to advance an equity action seeking an accounting by a *de facto* political action committee. In our
(continued…)

enforcement responsibility in PEMA) to militate in Providers' favor,[11] we do not agree that it creates a dispositive presumption in the construction of an ambiguous statutory regime.

On the other hand, the principle that, where there is a right, there should also be a remedy, referenced by the County and its *amici*, is equally subject to exception. *See, e.g.*, *Salazar v. Allstate Ins. Co.*, 549 Pa. 658, 670, 702 A.2d 1038, 1044 (1997) (holding that a remedy was unavailable to an insured for violation of a particular statutory duty on the part of an insurer). Plainly, the Legislature enjoys additional latitude in the prescription for remedies in instances in which it establishes a new duty or interest that is purely a creation of statute and concomitantly determines the extent of any available enforcement authority and/or remedial recourse. *See, e.g.*, *id.* In this regard, there

---

(…continued)
judgment, the case has limited bearing on a matter involving competing claims by governmental instrumentalities to enforcement authority relative to the funding for an integral emergency communications system. Moreover, in *Lurie*, while the Court relied on the general presumption that statutory remedies are exclusive, it also took the opportunity to evaluate the adequacy of the remedy provided. *See id.* at 63-64, 192 A.2d at 369.

[11] Similarly, as Providers highlight, the Legislature's failure to grant enforcement authority in the provision of the 911 Act specifying the "[p]owers and duties" of counties suggests against implying enforcement authority based on ambiguous language. 35 Pa.C.S. §5304(a) (superseded). And, notably, this omission stands in contrast to the specification of PEMA's "[p]owers and duties," including "[t]o take the actions necessary to implement, administer *and enforce* the provisions of this chapter." *Id.* §5303(a)(12) (emphasis added) (superseded). *See generally Commonwealth v. Berryman*, 437 Pa. Super. 258, 267, 649 A.2d 961, 965 (1994) ("Where a legislature includes specific language in one section of a statute and excludes it from another, that language should not be implied where excluded.").

simply is no underlying vested entitlement to be protected, since the only interest or entitlement derives from the statute itself.[12]

The current scenario concerns an interest, on the part of the County, that is entirely statutory and was created at the same time that duties were imposed on Providers. Significantly, moreover, under the 911 Act, service providers were "'captive' co-participants" in that they were required to perform under express statutory mandates with "no contract, no business transaction, and no reciprocation." *Hamilton Cty. Emergency Commc'ns Dist. v. BellSouth Telecommc'ns LLC*, 852 F.3d 521, 532 (6th Cir. 2017). We are circumspect about the notion that the Legislature would have conscripted service providers into performing a governmental service -- and then knowingly subjected them to disparate actions in 67 counties throughout the Commonwealth pertaining to the new statutory duties involuntarily imposed -- without clearly specifying its intentions in this regard. Instead, it is more likely that the Legislature contemplated that any enforcement exercised against service providers would be undertaken by PEMA in a centralized fashion, consistent with the agency's duties explicitly specified in the statute. *See* 1 Pa.C.S. §1504.[13]

---

[12] There is presently no need for us to discuss the range of circumstances under which a constitutionally protected, vested interest might arise from the creation of a new right or duty in a statute. Rather, our present analysis is directed to the circumstances at hand, involving the Legislature's conferral of a funding to subordinate governmental units subject to terms and conditions contemplated by the Legislature, as well as the associated enlistment of private companies to assist in the endeavor.

[13] Our assessment, in this regard, is consistent with the "[e]nforcement" section of the 911 Act, per which the General Assembly invested in PEMA the "power and duty to enforce and execute" the terms of the Act, including the right to "institute injunction, mandamus or other appropriate legal proceedings *to enforce this chapter* and regulations promulgated under this chapter." 35 Pa.C.S. §5311.13 (emphasis added) (repealed). Again, there was no corollary provision pertaining to counties.

(continued…)

As to the principle of constitutional avoidance referenced by the County, we find that it does not pertain here. Again, the County had no vested entitlement to the funding stream that was made available to it under the 911 Act that might foreclose the Legislature from making reasonable policy judgments, and balancing respective interests, by providing for centralized enforcement in the governing enactment itself. Indeed, one purport of the County's argument is that the General Assembly simply *could not* centralize enforcement over a funding scheme benefitting counties in a state agency without offending the property rights of local government. Even putting aside the substantial question concerning whether subordinate government units may assert property rights as such arising from funding mechanisms designed by the Legislature, we differ with the position that such rights could be advanced so as to constrain reasonable legislative policy judgments concerning enforcement.

After balancing the relevant considerations, and consistent with the rulings of the Commonwealth Court and the court of common pleas, we hold that Section 5307(e)(1) did not invest counties with the authority to pursue enforcement of new duties involuntarily imposed on service providers under the 911 Act.[14]

---

(…continued)

As previously noted, the County explains that it had the express power to enter into contracts for the implementation of a plan under the 911 Act. *See* 35 Pa.C.S. §5304(a)(5) (superseded). Thus, it urges, to make such agreements meaningful it must be afforded some implied enforcement authority. Of course, the duties arising under contracts are not merely creatures of statute; although the statute serves as an enabling platform, the contract is a voluntary undertaking on the part of the participants that itself serves as the predicate for enforcement. As discussed above, the same is not true of the collection responsibilities involuntarily imposed upon service providers per the 911 Act.

[14] As an aside, we note that the General Assembly has removed even Section 5307(e)(1)'s more limited authorization from the statute. *See* 35 Pa.C.S. §5306.2(c) (allocating this power as well to PEMA).

### III.  The County's Common Law Claims

Based on essentially the same considerations discussed above, we also conclude that the Legislature did not intend to sanction the advancement by counties of common law claims to enforce the new duties that were imposed involuntarily on service providers in the 911 Act.

Some jurisdictions have suggested that, where a legislature creates a new right or duty that "is wholly the creature of statute," common law claims are inapposite. *Sch. Comm. of Boston v. Reilly*, 285 N.E.2d 795, 798 (Mass. 1972).  From our point of view, however, the matter generally is one of legislative intent to be discerned, ideally, from the plain language of the enactment under review or, if necessary, via the application of principles of statutory construction.

Responding to the Commonwealth Court's analysis, there is no question that the County's interest here is substantial and that the harm to it, if its underlying legal position is correct, may be great.  Nevertheless, in our view, the Legislature has balanced counties' interests against those of other co-participants enlisted under the 911 Act and provided sufficient indicia evincing its intention to centralize enforcement authority in the relevant state agency.[15]  Although we realize that the County may have been disadvantaged by PEMA's apparent failure to act, this unfortunate circumstance does not control the judicial construction of a legislative enactment.

---

[15] The decision in *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 603 Pa. 198, 983 A.2d 652 (2009), is distinguishable, *inter alia*, in that the obligations in issue were not purely imposed involuntarily by statute but, rather, arose under a contractual overlay. *See id.* at 210-12, 983 A.2d at 659; *see also supra* note 13.

The order of the Commonwealth Court is reversed, and the matter is remanded for reinstatement of the order of the common pleas court.

Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.

Justices Todd and Wecht file concurring opinions.