**[J-55-2022] [MO:Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| THE MARCELLUS SHALE COALITION, | : | No. 69 MAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 573 |
| | : | MD 2016 dated August 12, 2021. |
| v. | : | |
| | : | ARGUED:  September 15, 2022 |
| | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION  OF THE | : | |
| COMMONWEALTH OF PENNSYLVANIA | : | |
| AND ENVIRONMENTAL QUALITY BOARD | : | |
| OF THE COMMONWEALTH OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellants | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                        **DECIDED:  April 19, 2023**

My views of this case align with much of the Lead Opinion's thoughtful reasoning. Nonetheless, I am unable to agree with certain analytical choices that it has elected to make along the way.  Specifically, I disagree with the categorical rejection of *ejusdem generis*.  Instead of applying this familiar principle, the Lead Opinion chooses to favor an assumption that the General Assembly, in using the term "public resources" in Section 3215(c) of Act 13,[1] necessarily intended to incorporate all "public *natural* resources" within the meaning of the Environmental Rights Amendment to the Pennsylvania Constitution.[2]

---

[1]     58 Pa.C.S. § 3215(c).  *See* Act of February 14, 2012, P.L. 87, No. 13 ("Act 13").

[2]     PA. CONST. art. I, § 27 (the "ERA") ("The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment.  Pennsylvania's public natural resources are the common property of all the (continued…)

The scope of legislative rulemaking authority provided to the Department of Environmental Protection and the Environmental Quality Board should be assessed through ordinary principles of statutory construction and by reference to our existing administrative law jurisprudence, rather than through invocation of the ERA.[3] Additionally, with regard to one sub-issue—the regulatory incorporation of a database through which protected species may be added in the absence of formal rulemaking procedures—my views align with those expressed by Justice Mundy. Accordingly, I concur in part and dissent in part.

In numerous previous decisions, I have expressed my long-held view that judicial interpretation of statutes should not be controlled by "deference" to the readings suggested (much less demanded) by administrative agencies.[4] The question presented here is of a different shade. Here, we are not so much concerned with the Agencies' interpretation of Act 13, or any purported need to defer thereto, but rather with the substantive validity of properly promulgated "legislative" rules.[5] It is well-established that,

---

people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.").

[3]     Herein, I refer to the Department of Environmental Protection as "the Department" and to the Environmental Quality Board as "the EQB," and I refer collectively to these entities as "the Agencies."

[4]     *See Woodford v. Ins. Dep't*, 243 A.3d 60, 86-87 (Pa. 2020) (Wecht, J., concurring); *SEDA-COG Joint Rail Auth. v. Carload Express, Inc.*, 238 A.3d 1225, 1248-49 (Pa. 2020) (Wecht, J., concurring); *Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 686-95 (Pa. 2020) (Wecht, J., concurring); *Harmon v. Unemployment Comp. Bd. of Rev.*, 207 A.3d 292, 310-11 (Pa. 2019) (Wecht, J., concurring); *Cnty. of Butler v. CenturyLink Commc'ns, LLC*, 207 A.3d 838, 853-54 (Pa. 2019) (Wecht, J., concurring); *Snyder Bros., Inc. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1056, 1083 (Pa. 2018) (Wecht, J., concurring).

[5]     As this Court has explained:

> Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly, which is, as

(continued…)

"when an agency adopts a regulation pursuant to its legislative rule-making power . . . it is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable."[6] In my previous writings on administrative law matters, I likewise have distinguished the application of deference to agencies' statutory interpretation from "agency rulemaking power, which is robust, and which is entitled to a healthy judicial respect."[7]

In the present matter, there is no dispute that the Agencies promulgated the challenged regulations pursuant to the proper notice-and-comment procedures prescribed by the Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act.[8] Accordingly, the validity of the regulations hinges upon

---

a general rule, by way of recourse to procedures prescribed in the Commonwealth Documents Law, [45 P.S. §§ 1102-1602; 45 Pa.C.S. §§ 501–907,] the Regulatory Review Act, [71 P.S. §§ 745.1-745.14,] and the Commonwealth Attorneys Act[, 71 P.S. §§ 732-101-732-506]. When an agency acts under the general rule and promulgates published regulations through the formal notice, comment, and review procedures prescribed in those enactments, its resulting pronouncements are accorded the force of law and are thus denominated "legislative rules."

*Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 66 A.3d 301, 310 (Pa 2013).

[6]     *Tire Jockey Serv., Inc. v. Dep't of Env't Prot.*, 915 A.2d 1165, 1186 (Pa. 2007). Although this legal standard predates this Court's decision in *Tire Jockey*, both the Agencies and several of our previous opinions refer to it as the "*Tire Jockey* test." I do the same herein.

[7]     *Snyder Bros.*, 198 A.3d at 1083 (Wecht, J., concurring) (citing *Bucks Cnty. Servs., Inc. v. Phila. Parking Auth.*, 195 A.3d 218, 242 (Pa. 2018) (Wecht, J. concurring)).

[8]     As noted by both the Lead Opinion and Justice Mundy, and as discussed further below, one facet of the challenge to the regulatory definition of "other critical communities" involves a contention that the definition runs afoul of the Commonwealth Documents Law by effectively adding substantive material without going through the proper notice-and-comment procedure. But it is undisputed that the definition is contained in a regulation that was properly promulgated.

the first and third prongs of the *Tire Jockey* test—to wit, whether they were "adopted within the agency's granted power" and whether they are "reasonable."[9]

## I. Scope of the Agencies' Granted Power

A central challenge in evaluating the validity of a regulation is determining whether its provisions fall "within the agency's granted power."[10]  As the Lead Opinion notes, this is the "key question" at the heart of the instant dispute.[11]  In answering similar questions, this Court's precedents have tended to focus principally upon the existence of an enabling statute[12] that authorizes or directs an agency to promulgate regulations, in conjunction with an analysis of whether the regulations are consistent with the statute that the agency seeks to implement.  Several of our past cases concerning the validity of legislative regulations are instructive.

*Pennsylvania Human Relations Commission v. Uniontown Area School District*[13] concerned the authority of the Pennsylvania Human Relations Commission to promulgate a regulation defining "*de facto* segregation" as used in the Pennsylvania Human Relations Act.[14]  This Court concluded that the agency's authority derived from its delegated legislative, rather than interpretive powers, and that the agency's enabling statute evidenced a "legislative intent to empower the Commission to do a good deal more than

---

[9]     *Tire Jockey*, 915 A.2d at 1186.

[10]     *Id.*

[11]     Lead Op. at 26.

[12]     An "enabling statute" is "law that permits what was previously prohibited or that creates new powers; esp., a congressional statute conferring powers on an executive agency to carry out various delegated tasks."  *Enabling statute*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[13]     313 A.2d 156 (Pa. 1973) (plurality).

[14]     Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-63.

merely interpret" the governing statute.[15] The agency's power emanated from the statutory language authorizing the agency to "adopt, promulgate and rescind rules and regulations to effectuate the policies and provisions of [the] act," and to "formulate policies to effectuate the purposes of [the] act."[16] In light of this language, and because the agency's definition was consistent with the policies expressed in the statute, we upheld the regulation "as within the legislative powers conferred" by the General Assembly.[17]

In *Eagle Environmental II, L.P. v. Department of Environmental Protection*,[18] we considered, *inter alia*, whether the EQB was empowered to adopt a "harms/benefits" test as part of the permitting process for waste disposal facilities—a test not directly imposed by statute. Because the agency's test was consistent with the purposes of the Solid Waste Management Act[19] and the Municipal Waste Planning, Recycling and Waste Reduction Act,[20] we held that the regulation was "authorized by the general grant of authority" provided to EQB by the agency's enabling provisions, which empowered it "to establish rules and regulations to accomplish the purposes" of those acts.[21] And although we subsequently discussed the ERA and the statutes' reference thereto among their statements of purpose, we also made clear that the harms/benefits test "would be within

---

[15]     *Uniontown Area Sch. Dist.*, 313 A.2d at 170.

[16]     *Id.*

[17]     *Id.*

[18]     884 A.2d 867 (Pa. 2005).

[19]     Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.101-6018.1003.

[20]     Act of July 28, 1988, P.L. 556, *as amended*, 53 P.S. §§ 4000.101-4000.1904.

[21]     *Eagle Env't*, 884 A.2d at 878 (citing 35 P.S. § 6018.105; 53 P.S. § 4000.302).

the authority granted by the Acts even without reference to implementation of Article 1, Section 27."[22]

In *Slippery Rock Area School District v. Unemployment Compensation Board of Review*,[23] this Court considered whether the Department of Labor and Industry could, by regulation, define the undefined statutory term "reasonable assurance" that a substitute teacher would return to work the following academic year as having been offered a position "substantially economically equivalent in terms of wages, benefits, and hours to the previous year's position."[24]  In finding that the agency was so authorized, we relied primarily upon the statutory enabling language providing that it "shall have power and authority to adopt, amend, and rescind such rules and regulations . . . as it deems necessary or suitable."[25]  This enabling provision indicated that the scope of the agency's authority was "broad and encompasses the delegated legislative power to define by regulation terms otherwise undefined by the statute."[26]

More recently, in *Bucks County Services*, this Court addressed a challenge to numerous regulations promulgated by the Philadelphia Parking Authority concerning the operation of partial rights taxicabs within the City of Philadelphia.[27]  Although our primary focus was upon the "reasonableness" prong of the *Tire Jockey* test, we noted that the first prong—the scope of the agency's power—was "satisfied because [the agency] is

---

[22]    *Id.* at 879.

[23]    983 A.2d 1231 (Pa. 2009).

[24]    *Id.* at 1235 n.4 (citing 34 Pa. Code § 65.161).

[25]    *Id.* at 1239 (quoting 43 P.S. § 761(a)).

[26]    *Id.*

[27]    *See Bucks County Services*, 195 A.3d at 233-39.

authorized by [53 Pa.C.S. § 5722] to promulgate regulations relating to taxicab service in the City."[28]

In each of these decisions, this Court analyzed the scope of an agency's authority to adopt a given regulation by highlighting the existence of an enabling statute, and by further ascertaining whether the regulation was generally consistent with the overarching statutory scheme that the agency sought to implement. Although the enabling statutes occupied a position of primacy in the analysis, that latter criterion is likewise critical. And necessarily, this requires some degree of judicial interpretation of the statutes that the agency is charged with administering. As this Court stated in *Slippery Rock Area School District*:

> Clearly the legislature would not authorize agencies to adopt binding regulations inconsistent with the applicable enabling statutes. *See* 1 Pa.C.S. § 1922(1) ("the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable"). Indeed, all regulations, whether legislative or interpretive "must be consistent with the statute under which they were promulgated." *Popowsky v. Pennsylvania Pub. Util. Comm'n*, 910 A.2d 38, 53 (Pa. 2006).[29]

And as the Supreme Court of the United States more recently (and more pithily) put it: "Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'"[30]

A balance must be struck. A court reviewing the validity of regulations necessarily must engage in its own statutory interpretation analysis in order to determine whether the

---

[28]     *Id.* at 237.

[29]     *Slippery Rock Area Sch. Dist.*, 983 A.2d at 1241 (citation modified).

[30]     *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) (quoting Ernest Gellhorn & Paul Verkuil, *Controlling Chevron-Based Delegations*, 20 CARDOZO L. REV. 989, 1011 (1999)).

regulations are "consistent with the statute under which they were promulgated."[31] Yet, an agency empowered to implement a statute through its legislative rulemaking prerogative must be allowed the flexibility to do so without fear that a court may strike down its properly promulgated regulations merely because the court differs with the agency on some minor point of statutory interpretation.[32] As we previously have explained, "substantive rulemaking is a widely used administrative practice, and its use should be upheld whenever the statutory delegation can reasonably be construed to authorize it."[33] This does not mean that we must afford unqualified "deference" to an agency's statutory interpretation—a jurisprudential shortcut of which I continue to disapprove.[34] But it does mean that, in conducting our own statutory construction, we must maintain a "healthy judicial respect" for the intent of the General Assembly to imbue the agency with rulemaking authority, as expressed in the enabling statute.[35] In practice, when a statute is equally amenable to two constructions—one that would permit the agency's regulation and one that would not—any "deference" to the agency effectively should take the form of a "tiebreaker," rather than any substantive limitation upon the court's duty and prerogative to independently interpret the statute.[36]

---

[31]    *Slippery Rock Area Sch. Dist.*, 983 A.2d at 1241.

[32]    *Accord Tire Jockey*, 915 A.2d at 1186 ("To demonstrate that the agency has exceeded its administrative authority, 'it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or lack of wisdom in exercising agency power is not equivalent to abuse.'" (quoting *Hous. Auth. of Cnty. of Chester v. Pa. State Civil Ser. Comm'n*, 730 A.2d 935, 942 (Pa. 1999)).

[33]    *Eagle Env't*, 884 A.2d at 877.

[34]    *See supra* n.4 and the cases cited therein.

[35]    *Snyder Bros.*, 198 A.3d at 1083 (Wecht, J., concurring).

[36]    *See id.* (Wecht, J., concurring) ("Statutory interpretation is an important part of the work that we do. We do not subcontract that interpretive enterprise to administrative agencies.").

Turning to the instant case, as the Lead Opinion details, we are asked to determine whether the Agencies were empowered to add certain items to the list of "public resources" identified in Section 3215(c) of Act 13,[37] and to provide a definition for one of the undefined terms in that list. As our previous cases teach, the analysis begins with the enabling statute. Section 3274 provides that the "Environmental Quality Board shall promulgate regulations to implement this chapter."[38] Unquestionably, this provision grants the EQB regulatory authority over the chapter in which Section 3215(c) appears.[39]

Critically, Section 3215(c) provides that the relevant "public resources" include, but are not limited to, those identified in the statutory list.[40] This is an unambiguous

---

[37]    58 Pa.C.S. § 3215(c).

[38]    58 Pa.C.S. § 3274.

[39]    As the Lead Opinion highlights, another subsection of Section 3215 also specifically directs the EQB to "develop by regulation criteria" for the Department to utilize when "conditioning a well permit based on its impact to the public resources identified under subsection (c) and for ensuring optimal development of oil and gas resources and respecting property rights of oil and gas owners." 58 Pa.C.S. § 3215(e)(1); *see* Lead Op. at 29.

[40]    Although the Lead Opinion twice reproduces the Section 3215(c) list of public resources in its Opinion, *see* Lead Op. at 3-4 & 28 n.10, I likewise include it here for ease of reference:

> **(c) Impact.**--On making a determination on a well permit, the department shall consider the impact of the proposed well on public resources, *including, but not limited to*:
>
> (1) Publicly owned parks, forests, game lands and wildlife areas.
>
> (2) National or State scenic rivers.
>
> (3) National natural landmarks.
>
> (4) Habitats of rare and endangered flora and fauna and other critical communities.
>
> (5) Historical and archaeological sites listed on the Federal or State list of historic places.

(continued…)

expression of the General Assembly's intent that the list it provided is nonexclusive.[41]
And as Section 3274, the enabling statute, vests in the EQB the authority to promulgate
regulations to implement Section 3215, it is clear that the EQB is the entity empowered
to add items, through its rulemaking power, to the nonexclusive statutory list.

This much is uncontroversial, and I discern no basis for disagreement between the
Lead Opinion and myself up to this point in the analysis. Where I part ways with the Lead
Opinion is in its identification of "the factor" that it deems "decisive in ascertaining
legislative intent."[42] The Lead Opinion, echoing a comment made by the Commonwealth
Court below, concludes that the General Assembly's reference to "public resources" in
Section 3215(c) is "rooted in" the ERA.[43] Although the Lead Opinion concedes that the
"ERA's conception of 'public resources' . . . is broad and undefined,"[44] and indeed
suggests that it is "perhaps impossible" to "definitively resolve what would qualify as a
'public resource'" under the ERA,[45] the Lead Opinion nonetheless finds that the General
Assembly clearly intended to incorporate into Section 3215(c) all that this (purportedly)
constitutional phrase is meant to encompass.

---

        (6) Sources used for public drinking supplies in accordance with
        subsection (b).

58 Pa.C.S. § 3215(c)(1)-(6) (emphasis added).

[41]    *See Dep't of Env't Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa.
2014) ("[I]t is widely accepted that general expressions such as 'including,' or 'including
but not limited to,' that precede a specific list of included items are to be considered as
words of enlargement and not limitation.").

[42]    Lead Op. at 31.

[43]    *Id.*

[44]    *Id.* at 36.

[45]    *Id.* at 33.

The principal problem with this rationale is that, despite its repeated invocation of "the ERA's conception of 'public resources,'"[46] the Lead Opinion glosses over the fact that the ERA does not, in fact, refer to "public resources."  Rather, the ERA speaks of "public *natural* resources."[47]  This reveals an obvious flaw in the Lead Opinion's reasoning.  Its attempt to find symmetry between the statute's use of the phrase "public resources" and the ERA's use of the phrase "public natural resources" fails to account for the General Assembly's inclusion of plainly "non-natural" resources within Section 3215(c).  Specifically, among the "public resources" listed in Section 3215(c) are "[h]istorical and archaeological sites listed on the Federal or State list of historic places."[48]

To appreciate just how "non-natural" many of the items which fall into this category are, one need only consult the National Register of Historic Places, as maintained by the National Park Service.[49]  As just a very small sampling of such historic sites located in Pennsylvania, consider whether the following constitute public *natural* resources within the meaning of the Environmental Rights Amendment:  the Smithfield Street Bridge in Pittsburgh; the Ajax Metal Company Plant in Philadelphia; the Hampden Fire House in Reading; the King of Prussia Inn in King of Prussia; the Stegmaier Brewery in Wilkes-Barre; or the Merion Cricket Club in Haverford.  It appears to me that these places are not of the sort intended to be protected under the ERA, which speaks of our citizens' right

---

[46]     *Id.* at 34, 36, 41.

[47]     *See* PA. CONST. art. I, § 27 (emphasis added); *supra* n.2.

[48]     58 Pa.C.S. § 3215(c)(5).

[49]     *See* National Register of Historic Places, National Register Database and Research, https://www.nps.gov/subjects/nationalregister/database-research.htm (last visited April 14, 2023).

to "clean air," "pure water," and the "natural, scenic, historic and esthetic values of the environment."[50]

The Lead Opinion identifies a similar example but does not acknowledge this inconsistency. In its effort to demonstrate the error in the Commonwealth Court's conclusion that Section 3215(c) cannot include items of "purely private property," the Lead Opinion points to Fallingwater, Frank Lloyd Wright's feat of architectural design in Fayette County.[51] Because Fallingwater is owned by a private nonprofit conservation organization, yet clearly is encompassed within Section 3215(c)(5)'s reference to federally listed historic places, the Lead Opinion concludes that items falling within the Section 3215(c) list need not be publicly owned.[52] I wholly agree. But what the Lead Opinion fails to acknowledge is that the inclusion of Fallingwater—an impressive *manmade* structure—just as persuasively demonstrates that items falling within Section 3215(c) also need not be "natural."[53] Necessarily, then, such items need not be "public natural resources" within the meaning of the ERA.[54]

---

[50]    PA. CONST. art. I, § 27. *See also Robinson Township v. Commonwealth*, 83 A.3d 901, 955 (Pa. 2013) (plurality) (stating that the ERA's "concept of public natural resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna").

[51]    Lead Op. at 34.

[52]    *Id.* (concluding that the Section 3215(c) list "does not neatly break down into 'purely private' and 'purely public' categories").

[53]    The Lead Opinion expresses shock that I might suggest that Fallingwater is not a "natural resource" within the meaning of the ERA. *Id.* at 35-36. Heretic though I may be, it cannot escape my notice that Fallingwater is a house. It is a beautiful house, indeed, but scenic beauty does not transform a house into a "natural resource."

[54]    The Lead Opinion contends that the constitutional meaning of "public natural resources" is not "cabined by natural or man-made categories." *Id.* at 35. It is puzzling, to say the least, to suggest that "natural resources" need not be "natural."

Put simply, equating Section 3215(c) with the ERA is underinclusive. It fails to explain the General Assembly's inclusion of items within Section 3215(c) that would not fall within the ERA.[55] Although the Lead Opinion refers to the "ERA's conception of 'public resources'" (omitting the word "natural") as "embracing 'broadly defined values of the environment,'" and stresses that those include "historic and esthetic values,"[56] I doubt that anyone would believe that such values of the *environment*, however broadly defined, would encompass a steel truss bridge, a metal plant, or a country club. Yet, as demonstrated above, these and many more such "non-natural" structures nonetheless fall within Section 3215(c)(5).

After stuffing Section 3215(c) into the ERA's ill-fitting clothes, the Lead Opinion takes the next major analytical step with which I differ. It declares that the statutory construction doctrine of *ejusdem generis* "plays no role in the statutory analysis."[57] This follows from its previous conclusion, the Lead Opinion explains, because the term "'public resources' already has a defined meaning within the statutory framework of the Oil and Gas Act: public resources as understood by the ERA."[58, 59] The Lead Opinion jettisons

---

[55] To be clear, I do not, as the Lead Opinion surmises, suggest that the ERA has absolutely nothing to do with the items listed in Section 3215(c). *See id.* I recognize that protection of natural resources "secured by the Constitution of Pennsylvania" is one of the legislative purposes specified in Act 13. 58 Pa.C.S. § 3202(4). Where I differ with the Lead Opinion is that I merely recognize that Section 3215(c) is broader than the ERA, because it clearly contains items that are not, in any sense, natural resources.

[56] Lead Op. at 34 (quoting *Robinson Twp.* 83 A.3d at 951).

[57] *Id.* at 39.

[58] *Id.* at 40.

[59] Even under the Lead Opinion's account of Section 3215(c) and the ERA, the utility of its approach is questionable given its acknowledgment that the constitutional term "public . . . resources" is "broad and undefined" and perhaps incapable of comprehensive definition. PA. CONST. art. I, § 27; Lead Op. at 33, 36. If the constitutional standard is too broad to effectively define, then query what is gained by incorporating this purportedly "defined meaning" into Section 3215(c). Lead Op. at 40.

the ordinary tools of statutory interpretation in favor of the importation of a constitutional standard that, as I have explained above, fails to account for all of the items listed in Section 3215(c).

I would not be so quick to discard *ejusdem generis*. It is true that we have held that the doctrine "must yield in any instance in which its effect would be to confine the operation of a statute within narrower limits than those intended by the General Assembly when it was enacted."[60] This caveat is well-taken; however, we must remember that doctrines such as *ejusdem generis* are merely tools that we employ to ascertain legislative intent in the first place.[61] And as many of our precedents indicate, *ejusdem generis* is the preferred tool when we seek to determine whether a given item may be added to an "including but not limited to" list, like the one found in Section 3215(c).[62, 63]

The Lead Opinion states that Section 3215(c) contains "six specific items that do not share any obvious commonalities."[64] Although this is perhaps true if one seeks to

---

[60] *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020).

[61] *Id.* (describing *ejusdem generis* as a "useful tool of statutory construction" which is "used for the sole purpose of determining the intent of the General Assembly").

[62] *See Cumberland Coal Res.*, 102 A.3d at 976.

[63] In its effort to reject *ejusdem generis*, the Lead Opinion makes an additional comment that could prove perilous for future cases, and from which I must distance myself. It cites *Cumberland Coal Resources* for the proposition that *ejusdem generis* applies to "definitional" sections, and rejects its use here because "[t]his is not a situation where Section 3215(c) can plausibly be interpreted as a definitional section . . . ." Lead Op. at 40. But the application of *ejusdem generis*, to my knowledge, has never been limited strictly to statutory language that defines a term. Rather, the doctrine applies "where general words follow the enumeration of particular classes of persons or things," such that additional items must be "of the same general nature or class as those enumerated." *McClellan v. Health Maint. Org. of Pennsylvania*, 686 A.2d 801, 806 (Pa. 1996). Such "enumeration" need not be in the form of a definition, and the Lead Opinion's suggestion of the contrary poses a risk of introducing substantial confusion into our statutory construction jurisprudence.

[64] Lead Op. at 33.

find one single commonality that all six items share, I do not view this as precluding an *ejusdem generis* analysis. It is true that the items listed in Section 3215(c) defy universal categorization as "public" or "private," as the Lead Opinion aptly explains. And as I have shown above, they likewise cannot all be understood to be "natural resources" within the meaning of the ERA. But the doctrine of *ejusdem generis* expressly instructs us to view the statutory enumeration with a level of generality—that we must consider the "general nature or class" of the items enumerated.[65] As our Superior Court explained well over a century ago:

> But in applying this principle of construction, and in determining what things are *ejusdem generis*, regard must be had to the general subject to which the act relates. Things which plainly belong to the same class when one subject is being considered might belong to an entirely different class when considered with reference to another subject. The rule would be absurd if under the head "other" no thing can be included in the construction of the act which is not exactly the same in every particular as the thing specified. Nor has it been so applied.[66]

Moreover, I have found no precedent indicating that a court applying *ejusdem generis* necessarily must reduce a statutory list to a single commonality. Indeed, to do so may, in some circumstances, obscure the General Assembly's true intent by prioritizing superficial similarities over meaningful classifications. There is no requirement that the General Assembly confine its legislative efforts to precisely one category or class per statutory list. It follows that, where the statutory language so suggests, a court undertaking an *ejusdem generis* analysis may recognize that a statutory enumeration contains multiple classes of items, and may determine whether additional items are permissible by ascertaining whether they fall within one of the enumerated categories,

---

[65] *Cumberland Coal Res.*, 102 A.3d at 976; *McClellan*, 686 A.2d at 806.

[66] *Weiss v. Swift & Co.*, 36 Pa. Super. 376, 386-87 (Pa. Super. 1908).

*i.e.*, that they are "similar to those listed by the legislature and of the same general class or nature."[67]

This brings me to the challenged definitions contained within the regulations at issue. The Marcellus Shale Coalition ("MSC") challenged: the Agencies' inclusion of "common areas on a school's property" and "playgrounds" as "public resources"; the Agencies' definition of the statutory term "other critical communities"; and the Agencies' definition of "public resource agencies" as including "municipalities" and "playground owners."[68] As the Lead Opinion explains, these definitions are a part of the Agencies' regulatory scheme for implementing Section 3215(c). Under the regulations, an applicant proposing to drill an unconventional gas well within a specified distance of one of the listed "public resources" is obligated to provide notice to the "public resource agency" responsible for managing that public resource, as well as to the Department, which will consider, *inter alia*, the comments and recommendations of the "public resource agency" in connection with the application.[69]

As it concerns the definition that the Agencies provided for "other critical communities,"[70] as that term appears in Section 3215(c)(4), the question of the Agencies'

---

[67]      *Cumberland Coal Res.*, 102 A.3d at 976.

[68]      *See* 25 Pa. Code §§ 78a.1, 78a.15(f)-(g).

[69]      *See* 25 Pa. Code § 78a.15(f)-(g).

[70]      The regulatory definition of "other critical communities" is:

*Other critical communities* --

(i) Species of special concern identified on a [Pennsylvania National Diversity ("PNDI")] receipt, including plant or animal species:

     (A) In a proposed status categorized as proposed endangered, proposed threatened, proposed rare or candidate.

     (B) That are classified as rare or tentatively undetermined.

(continued…)

statutory authority is straightforward. This is a term that the General Assembly included within Section 3215(c), but did not define. As highlighted above, Section 3274 gives the EQB authority to promulgate regulations to implement, *inter alia*, Section 3215(c).[71] This enabling provision is "broad and encompasses the delegated legislative power to define by regulation terms otherwise undefined by the statute."[72] Plainly, providing a definition for such an undefined term is "within the agency's granted power."[73]

With regard to "common areas of a school's property" and "playgrounds," my views substantially align with the thoughtful Concurring and Dissenting Opinion authored in a previous iteration of this case, where this Court upheld a preliminary injunction that the Commonwealth Court issued to enjoin the challenged portions of the regulations.[74] Importantly, the regulations define both "common areas of a school's property" and "playgrounds" such that only areas which are open to the "general public for recreational purposes" are included.[75] As discussed above, our task is, at least in part, to determine whether these items are consistent with the "public resources" listed in Section 3215(c). By *ejusdem generis*, we may conclude that "common areas of a school's property" and "playgrounds" are of the same general nature or class as at least one of the items listed

---

(ii) The term does not include threatened and endangered species.

25 Pa. Code § 78a.1.

[71] 58 Pa.C.S. § 3274.

[72] *Slippery Rock Area Sch. Dist.*, 983 A.2d at 1239.

[73] *Tire Jockey*, 915 A.2d at 1186.

[74] *See Marcellus Shale Coal. v. Dep't of Env't Prot.*, 185 A.3d 985, 1009-11 (Pa. 2018) (*MSC II*) (Donohue, J., concurring and dissenting).

[75] *See* 25 Pa. Code § 78a.1 (defining "common areas of a school's property," in relevant part, as "[a]n area on a school's property accessible to the general public for recreational purposes"); *id.* (defining "playground," in relevant part, as "[a]n outdoor area provided to the general public for recreational purposes").

in Section 3215(c)—that of "publicly owned parks."[76]  As the minority opinion cogently explained in *MSC II*, these "resources share common characteristics, as the general public utilizes them in precisely the same way (for recreation)."[77]  To this I would add that other places listed in Section 3215(c) are commonly used by the public for recreation as well, namely publicly owned "forests," "game lands," and "scenic rivers," which the public uses for outdoor recreational activities such as hiking, camping, hunting, fishing, and boating.[78]  Accordingly, inclusion of additional outdoor public recreational spaces falls within the Agencies' granted power to expand upon the nonexclusive list provided in Section 3215(c), as signaled through the phrase "including, but not limited to."[79]

And finally, the Agencies possessed the power to define a "public resource agency" as including "playground owners" and "municipalities."[80]  As the Lead Opinion explains, the conclusion that the Agencies were authorized to include "playground owners" within the definition of a "public resource agency" follows from the determination that the Agencies were authorized to define "playgrounds" as "public resources."[81]  With

---

[76]     58 Pa.C.S. § 3215(c)(1).

[77]     *MSC II*, 185 A.3d at 1009 (Donohue, J., concurring and dissenting).

[78]     *See* 58 Pa.C.S. § 3215(c)(1) (including publicly owned "forests" and "game lands"); *id.* § 3215(c)(2) (including "National or State scenic rivers").

[79]     58 Pa.C.S. § 3215(c).

[80]     *See* 25 Pa. Code § 78a.1 (defining "public resource agency" as "[a]n entity responsible for managing a public resource identified in § 78a.15(d) or (f)(1) (relating to application requirements) including the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission, the United States Fish and Wildlife Service, the United States National Park Service, the United States Army Corps of Engineers, the United States Forest Service, counties, *municipalities* and *playground owners*.") (emphasis added).

[81]     *See* Lead Op. at 59 ("[O]ur determination that a 'playground' is a valid public resource effectively resolves this legal challenge because the 'owner' of that resource is responsible for it.").

regard to the inclusion of "municipalities," MSC's argument goes that, because this Court in *Robinson Township* struck down Section 3215(d),[82] which stated that the Department "may" consider the comments of municipalities in connection with a well permit (because such consideration was facially optional rather than mandatory), the regulation's provision mandating such consideration now lacks statutory authority.  But the Agencies' power to promulgate binding regulations does not emanate from that now-invalidated subsection.  Rather, the Agencies' power derives from the enabling provision, Section 3274.  It is undisputed that the Agencies had the power to define "public resource agencies" to include, *e.g.*, the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission, the United States Fish and Wildlife Service, etc.[83] The Agencies' authority to include these entities in the definition of a "public resource agency" follows from their general authority to implement the statute, which calls upon the Department to "consider the impact of the proposed well on public resources."[84] Soliciting the comments of these entities is merely the mechanism by which the Agencies seek to comply with this mandate.  And just as the Agencies are empowered by the general grant of rulemaking authority to include the above-listed entities in the definition

---

[82]     Section 3215(d) provided:

> **(d) Consideration of municipality and storage operator comments.--** The department *may* consider the comments submitted under section 3212.1 (relating to comments by municipalities and storage operators) in making a determination on a well permit. Notwithstanding any other law, no municipality or storage operator shall have a right of appeal or other form of review from the department's decision.

58 Pa.C.S. § 3215(d) (emphasis added).  This subsection was held unconstitutional under the ERA in *Robinson Township.  See Robinson Twp.*, 83 A.3d at 984.

[83]     *See* 25 Pa. Code § 78a.1.

[84]     58 Pa.C.S. § 3215(c).

of "public resource agencies," so too are they empowered to include "municipalities." The now-invalid Section 3215(d) effectively is irrelevant to the issue of the Agencies' authority.

For these reasons, I conclude that all of the challenged definitions were "adopted within the agency's granted power," and thus satisfy the first prong of the *Tire Jockey* test.[85] All that remains is the final prong—whether those definitions are "reasonable."[86]

## II. Reasonableness

Our test for the validity of a legislative rule frames the "reasonableness" inquiry in highly deferential terms:

> In deciding whether an agency action, such as promulgation of a legislative regulation, is reasonable, we are not at liberty to substitute [our] own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action involved, it is not enough that [the agency's regulation] shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be so entirely at odds with fundamental principles as to be the expression of a whim rather than an exercise of judgment.[87]

We have added that, "[r]egarding the reasonableness prong, 'appellate courts accord deference to agencies and reverse agency determinations only if they were made in bad faith or if they constituted a manifest or flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.'"[88]

This standard appears to me to be more exacting than a mere inquiry into "reasonableness," and may be more accurately characterized as a test for "irrational"

---

[85]   *Tire Jockey*, 915 A.2d at 1186.

[86]   *Id.*

[87]   *Slippery Rock Area Sch. Dist.*, 983 A.2d at 1242 (quoting *Uniontown Area Sch. Dist.*, 313 A.2d at 169).

[88]   *Tire Jockey*, 915 A.2d at 1186 (quoting *Rohrbaugh v. Pennsylvania Pub. Util. Comm'n*, 727 A.2d 1080, 1085 (Pa. 1999)).

agency action. "Reasonable" minds may sometimes differ as to whether a given action is "reasonable" under the circumstances. In asking instead whether a regulation is based upon a "whim," or "purely arbitrary," or "entirely at odds with fundamental principles," we seem to be asking for something more. Indeed, these characterizations echo the "arbitrary and capricious" standard by which the federal courts assess agency action, which contains a component of "rational connection" between an agency's choice and the facts upon which it is based.[89]

I find no indication that the challenged definitions reflect an expression of the Agencies' "whim," constitute a "flagrant abuse of discretion," are "purely arbitrary," or may be deemed "entirely at odds with fundamental principles." In this regard, my views align substantially with the reasoning offered by the Lead Opinion.[90] Much of MSC's arguments on this prong reduce to an assertion that it will be onerous to comply with the notice requirements established by the regulations. As the above-quoted standard makes abundantly clear, however, the mere fact that a regulation may impose a burden does not render it "unreasonable" for purposes of the *Tire Jockey* test.

### III. The PNDI Problem

As noted above, I agree with the Lead Opinion that it was within the Agencies' granted authority to provide a definition for the undefined statutory term "other critical communities." But I also agree with Justice Mundy that the definition chosen is

---

[89] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

[90] *See* Lead Op. at 56-58.

problematic.[91]  I quoted the definition in full above.[92]  The offending portion defines "other critical communities" to include: "Species of special concern identified on a PNDI receipt . . . ."[93]  The PNDI—the Pennsylvania Natural Diversity Inventory—is a database that other agencies use to list plant and animal species classified as threatened, endangered, or otherwise warranting special consideration or protection ("other critical communities," as the Agencies use the term).[94]

As MSC, the Commonwealth Court, and Justice Mundy explain, the defect in the procedure that the regulation envisions is that species can be added to or subtracted from the PNDI by entities other than the Agencies, without going through the formal notice-and-comment rulemaking process.  By defining the term "other critical communities" to include "whatever the PNDI says," the Agencies have adopted what is, in effect, a method of backdoor regulating by which entries into a database are given the force of law without meeting the requirements necessary to become lawful regulations.

---

[91]     *See* Diss. Op. at 6-8 (Mundy, J.)

[92]     *See supra* n.70.

[93]     25 Pa. Code § 78a.1.

[94]     The regulation defines "PNDI" as:

> The Pennsylvania Natural Heritage Program's database containing data identifying and describing this Commonwealth's ecological information, including plant and animal species classified as threatened and endangered as well as other critical communities provided by the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission and the United States Fish and Wildlife Service.  The database informs the online environmental review tool.  The database contains only those known occurrences of threatened and endangered species and other critical communities, and is a component of the Pennsylvania Conservation Explorer.

25 Pa. Code § 78a.1.  A PNDI receipt is defined as: "The results generated by the Pennsylvania Natural Diversity Inventory Environmental Review Tool containing information regarding threatened and endangered species and other critical communities." *Id.*

Although it implicates a distinct legal doctrine, the challenged definition is reminiscent of the problem that we confronted in *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*.[95] There, we concluded that the statutory incorporation of the "most recent addition" of the American Medical Association's *Guides to the Evaluation of Permanent Impairment*, which was to be used to determine an injured employee's degree of impairment for purposes of workers' compensation, was a violation of the non-delegation doctrine because it outsourced the General Assembly's policy-making responsibility to the future discretion of another entity.[96] By adopting future editions of the *Guides* without knowing what they would even contain, the General Assembly allowed another entity to make the essential policy choices and, in effect, to write the law of this Commonwealth. Importantly, we clarified that "the non-delegation doctrine does not prevent the General Assembly from adopting as its own a particular set of standards which already are in existence at the time of adoption."[97] But it does prohibit the legislature from "incorporating, sight unseen, subsequent modifications to such standards without also providing adequate criteria to guide and restrain the exercise of the delegated authority."[98]

The issue before us here differs inasmuch as it concerns not the General Assembly's delegation of its lawmaking authority, but rather the Agencies' delegation of its rulemaking prerogative. The theory behind MSC's challenge, moreover, is not non-delegation, but rather an asserted violation of the procedural requirements for promulgating regulations. But a *Protz* analogy remains instructive. The definition of

---

[95]    161 A.3d 827 (Pa. 2017).

[96]    *Id.* at 833-38.

[97]    *Id.* at 838.

[98]    *Id.* at 839.

"other critical communities" essentially represents a delegation of a delegation. The General Assembly delegated rulemaking power to the Agencies. The Agencies delegated that power to the PNDI database. In the language of *Protz*, the Agencies are "incorporating, sight unseen, subsequent modifications" to the PNDI database.[99] And, more to MSC's point, they are doing so without attending to the procedural requirements, prospectively transforming "each revision of the special concern species listed in the PNDI database [into] an unlawful amendment to the Chapter 78a regulation."[100]

The Agencies' rejoinder, which the Lead Opinion essentially adopts, is that although the PNDI database may vary over time and the results of its consultation may differ with respect to different sites, the *process* of using the PNDI database remains constant.[101] Thus, their argument goes, only that process needed to be formally promulgated. But this is not responsive to MSC's point. When any given species is added to the PNDI database as a species of special concern, the regulation imposes binding requirements upon applicants with respect to that species, notwithstanding the fact that the addition was not subject to notice-and-comment rulemaking.

## IV. Conclusion

In light of the foregoing, although I differ with much of the Lead Opinion's rationale, I nonetheless agree with its decision to reverse the order of the Commonwealth Court with regard to all but one of the challenged definitions. As it concerns the definition of

---

[99] *Id.*

[100] MSC's Br. at 51.

[101] *See* Agencies' Br. at 42 ("The *process* set forth in subsection 78a.15(f) requiring use of the PNDI tool is not 'ever-changing.' It is static.") (emphasis in original); Lead Op. at 45 ("[T]he Agencies gave appropriate public notice of the manner in which species of special concern were to be identified for purposes of information gathering in the pre-permitting stages of unconventional oil and gas wells. While the PNDI receipt information may vary by site and over time, the basis for inclusion in the statutorily mandated database does not.").

"other critical communities" and its incorporation of the PNDI database, I find a fatal procedural defect, and I would thus affirm the Commonwealth's Court's decision on that narrow point.

I thus respectfully concur in part and dissent in part.